729 F.2d 738
 UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,
v.
DEKALB COUNTY, Dekalb County Tax Assessors, Tom B. Parris,
Billie Ruth Smith, and Bernard Ratkin, County Tax Assessors
In Their Official Capacity, and Eugene E. Adams, County Tax
Commissioner In His Official Capacity, Defendants-Appellees,
Cross-Appellants,
v.
BANKERS LIFE COMPANY, Defendant in Counterclaim.
 No. 82-8742.
 United States Court of Appeals,
Eleventh Circuit.
 April 12, 1984.
 
 1
 Glenn L. Archer, Jr., Michael L. Paup, Chief Appellate Sec., David English Carmack, David I. Pincus, Tax Division, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.
 
 
 2
 George Dillard, Gail C. Flake, Decatur, Ga., for defendants-appellees.
 
 
 3
 Appeals from the United States District Court for the Northern District of Georgia.
 
 
 4
 Before TJOFLAT and HILL, Circuit Judges, and LYNNE*, District Judge.
 
 LYNNE, District Judge:
 
 5
 In proceedings below the United States sued to recover a refund of ad valorem taxes on personal property paid by mistake to Dekalb County, Georgia, for the years 1961 through 1978. The district court entered a judgment in its favor in the amount of $53,750.00 for payments made in years 1973 through and including 1979, applying the six year statute of limitations. 28 U.S.C. Sec. 2415(a).
 
 
 6
 By counterclaim, to which Bankers Life was added as a party defendant, the county sued to recover taxes for the years 1961 through 1979 on the leasehold interest of Bankers Life in the land to which the United States held fee simple title.[1] Applying the Georgia seven year statute of limitations, Ga.Code Ann. Secs. 92-7701 and 92-6913, the court awarded the county the sum of $25,500.00, representing escaped taxes of such leasehold interest for the years 1972 through and including 1979, thus reducing the judgment in favor of the United States to $28,200.
 
 
 7
 From the judgment on the counterclaim the United States and Bankers Life prosecuted this appeal; Dekalb County cross-appealed from the judgment in favor of the United States. We reverse on the appeal and affirm on the cross-appeal.
 
 
 8
 In March, 1958, the United States, acting through its General Service Administration (GSA), contracted with Henry C. Beck Company and Utah Construction Company, a joint venture, for the construction of a six-building complex (designated as the U.S. Communicable Disease Center, commonly known as the Center for Disease Control) on land owned by the United States at 1600 Clifton Road, Dekalb County, Georgia. Also in March, 1958, the United States, by GSA and pursuant to the provisions of the "Public Buildings Purchase Contract Act of 1954", 40 U.S.C. Sec. 356, entered into a "contract to finance" with Bankers Life for the latter's financing of the $8,790,000 cost of the improvements. This contract provided that the United States would begin repaying the loan upon its acceptance of the improvements, which occurred in 1960, and would repay it over a 25-year term at an interest rate of 4.97% per annum.[2] It provided that, during this 25-year term, Bankers Life would hold title to the improvements. It provided that as authorized by 40 U.S.C. Sec. 356(h), the United States would be responsible for all property taxes assessed against Bankers Life in connection with the property during the aforementioned term.[3]
 
 
 9
 On or about June 22, 1960, construction of the buildings was completed. From 1961 through 1978, the United States, either directly or by reimbursing Bankers Life, paid the real estate taxes assessed by the county with respect to those buildings and their contents. The personal property taxes, totalling approximately $265,658, were assessed against fixtures, including elevators, boilers, generators, transformers, and water pumps located within the buildings, notwithstanding they were not personal property, but were part of the real estate and taxed as such. Accordingly, the United States, by virtue of its contractual obligation to reimburse Bankers Life, was subjected to double taxation for the same items of property.
 
 
 10
 Incredibly, GSA did not become aware of this problem until 1978 or 1979. On September 7, 1979, the United States commenced the action sub judice to recover funds mistakenly paid from its treasury to Dekalb County. The county asserted four defenses: first, it denied that the same property was twice taxed; second, estoppel for failure to challenge the classification of property items for seventeen years; third, prior to 1975, Georgia law did not recognize the right of a taxpayer to obtain a refund of voluntarily paid taxes and that for 1975 and later years the United States failed to file an administrative claim for refund as required by Georgia law, and fourth, the six-year statute of limitations appearing in 28 U.S.C. Sec. 2415(a).
 
 
 11
 On the first three of the above issues, the lower court found for the United States, and on the fourth for the county. Only the third has been briefed and argued by the county on its cross-appeal.
 
 
 12
 It is true that prior to 1975, there was no Georgia statutory cause of action for the recovery of overpaid county property taxes. To a suit at common law for such a refund brought by a Georgia taxpayer, voluntary payment was regarded as a complete defense. As stated by the court in Hawes v. Smith, 120 Ga.App. 158, 169 S.E.2d 823, 824 (1969), in discussing the State tax refund statute (now codified at O.C.G.A., Sec. 48-2-35), which is analogous to the County tax refund statute (O.C.G.A., Sec. 48-5-380) at issue here:
 
 
 13
 [T]he right to sue for refund has always been an available remedy at common law, and the only effect of having such right expressly recognized by statute has been to remove the defense of voluntary payment (Code.Ann. Sec. 20-1007 [now codified at O.C.G.A., Sec. 13-1-13].
 
 
 14
 In contending that the district court was without subject matter jurisdiction because prior to 1975 payments of taxes were voluntarily made[4] and thereafter the administrative procedure provided by the Georgia statute[5] was ignored, the county misconceives the theory of the Government's claim. It was not posited upon state law, common or statutory, but upon Federal law. Its action sounded in quasi-contractus for the recovery of its treasury funds paid by mistake which resulted in the unjust enrichment of the county. Neither voluntary payment nor the failure to exhaust state administrative remedies was available as a defense to its claim.
 
 
 15
 We think the rationale of City of New Orleans v. United States, 371 F.2d 21, 23 (5th Cir.1967), is dispositive of this issue. Therein it was stated:
 
 
 16
 [We] think there is ample power in the United States District Court to protect the sovereign against such unjust enrichment on familiar principles of money had and received .... (citations omitted). This harmonizes with the usual principle that Federal law fashions remedies for recovery of funds or property of the United States--including those from invalid tax exactions.
 
 
 17
 Id. at 28.
 
 
 18
 The essential factual difference between New Orleans and the case sub judice is without a distinction. There the city assessed Chrysler, a government contractor, a "use" tax on tangible personal property. Pursuant to the pertinent city ordinance and at the suggestion of the Government, Chrysler paid the tax under protest and a special escrow agreement. Thereafter the Government reimbursed Chrysler for the cash and government bonds. It developed that title to such property was in the Government rather than in Chrysler and was therefore free from city taxation. Summary judgment in favor of the United States for the recovery of the treasury funds expended to reimburse Chrysler was affirmed. Here, its funds were disbursed to pay county taxes doubly assessed contrary to law. We are content to follow New Orleans and affirm the judgment in favor of the United States.
 
 
 19
 On its appeal the United States contends that the district court erred in holding that Bankers Life had in land owned by it a leasehold taxable under Georgia law[6] and, in the alternative, the district court erred in valuing that leasehold. The first issue is one of law, involving the construction of the contract between the United States and Bankers Life. This crudely drafted contract is divided into four titles: Title I--Definitions; Title II--Financing of the Improvements by the Investor; Title III--Purchase Contract, and Title IV--Taxes. Set out in the margin are those provisions in which the terms "lease" and "leasehold" appear.[7]
 
 
 20
 Although the language appearing in Title II, Article 4(a), is that traditionally employed to convey an estate for years, it is incumbent upon us to analyze the entire contract, instructed by Georgia law that the substance of the agreement rather than its form controls. Allright Parking, Inc. v. Joint City-County Board of Tax Assessors, 244 Ga. 378, 386, 260 S.E.2d 315, 320 (1979); Henson v. Airways Service, Inc., 220 Ga. 44, 136 S.E.2d 747 (1964). Beyond peradventure, the restriction on Bankers Life's right to the possession of the site solely for the purpose of performing its obligations under the contract,[8] i.e. to finance the improvements to be constructed thereon, is antithetical to the nature of an estate for years. Ga.Code Sec. 85-803 (1935) (current version at O.C. Ga. Sec. 44-6-103.[9] See also 3 G. Thompson, Real Property, Sec. 1032, at 108 (1980 repl.)
 
 
 21
 When the lease language of this contract is construed in tandem with the government's agreement to mortgage to the investor the Site,[10] the investor's election to convey the improvements and its leasehold interest to a trustee,[11] and the investor's right to assign its claims for moneys due from the government under the contract to a bank, trust company, or other financing institution,[12] it becomes a flimsy fiction. To quote the observation of an anonymous home-spun philosopher: "No matter what it's called, a thing can't be what it ain't."
 
 
 22
 By the foregoing analysis, we are persuaded that the district court erred in holding that Bankers Life had in land owned by the United States a leasehold estate taxable under Georgia law; that in reality, the government endeavored in this contract, considered in its entirety, to afford Bankers Life the means to enlist the participation of other financial institutions in its undertaking. In its true light, it is seen as the creation of a security interest not subject to Georgia taxation.
 
 
 23
 REVERSED AND REMANDED ON THE APPEAL; AFFIRMED ON THE CROSS-APPEAL.
 
 
 
 *
 Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 Throughout the contract under review the land owned by the United States on Clifton Road is referred to as the "Site". No Georgia taxes were assessed against the land itself but only against the buildings (improvements) erected thereon and their contents
 
 
 [2]
 In view of today's high and fluctuating interest rates, the interest rate of 4.97% per annum recited in the contract apparently triggered speculation at oral argument as to whether Bankers Life obtained the collateral benefit of depreciating its purported leasehold interest for tax purposes. In this respect, the record is silent; perhaps the parties recognized that in March, 1958, the interest rate on government bonds with maturity dates in excess of 10 years was 3.25% (Moody's Municipal and Government Manual, 1982, Vol. 1), and that Bankers Life realized an attractive return on its investment
 
 
 [3]
 Title IV, Article 1(a) of the contract provides:
 The Government shall pay directly to the taxing authorities for and on behalf of the owner of record all real estate taxes which are lawfully assessed, levied, confirmed, imposed, become a lien, or become payable during the term of the Purchase Contract.
 
 
 [4]
 A voluntary payment of public money made by public officers under no mistake of fact is not the equivalent in law of such a payment by an individual. Weiss v. United States, 296 F.2d 648 (5th Cir.1961); United States v. Paddock, 178 F.2d 394 (5th Cir.1949). Under Federal common law principles the United States has the right to sue for the recovery of funds paid from the Federal treasury, whether or not there exists any specific statutory authorization therefor. United States v. Wurts, 303 U.S. 414, 415-416, 58 S.Ct. 637, 638-639, 82 L.Ed. 932 (1938)
 
 
 [5]
 O.C.G.A. Sec. 48-5-380 authorizes counties in Georgia to refund taxes. However, this statute sets out specific procedures and requirements for such a refund. O.C.G.A. Sec. 48-5-380(b) specifically requires that the taxpayer:
 ... file a claim for a refund with the governing authority of the county or municipal corporation, at any time within one year, or in the case of taxes three years, after the date of the payment of such tax or license fee to the county or municipal corporation. Such claim shall be in writing and shall be in such form and contain such information as the governing authority of the County or municipal corporation may require. Such claim shall include a summary statement of the grounds upon which the taxpayer relies. In the event the taxpayer desires a conference or hearing before the governing authority in connection with any claim for a refund, he shall so specify in writing in the claim...
 Upon proper filing of a claim, O.C.G.A. Sec. 48-5-380 allows for a hearing on the claim and provides the complying taxpayer who is denied a refund, or who fails to receive an answer, the right to proceed in court. However, the Georgia legislature has specifically provided that this right to sue may not be exercised "before the expiration of one year from the date of filing the claim for refund..."
 Compare the New Orleans ordinance set forth in City of New Orleans v. United States, 371 F.2d 21, 23 (5 Cir.1967), at notes 3 and 4.
 
 
 [6]
 Act No. 68, 1937-38 (Ex.Sess.) Ga.Laws 156:
 Section 2. Real property (including leaseholds which are hereby classified as real property and tangible personal property shall be taxed as now provided by law.... (Current version at O.C.G.A. Sec. 48-5-3 (1982).
 
 
 [7]
 Title I, Article 1(g): "Real estate taxes" shall mean all taxes ... of any kind and nature whatsoever, applicable to the Improvements and the Investor's leasehold interest in the Site
 Title II, Article 4. Site Lease:
 (a) The Government hereby leases the Site to the Investor, to have and to hold with its appurtenances for a term of fifty-five (55) years beginning with the date the Government delivers possession of the Site: Provided, however, that this Lease shall terminate coincidentally with the termination of Title III, whether such termination occurs at the end of the term thereof or at an earlier date.
 (b) The Government shall deliver to the Investor possession and occupancy of the Site at the time of issuance to the Builder by the Government of Notice to Proceed with construction and the Investor, thereupon, shall permit the Builder to enter upon the Site.
 (c) The Investor shall pay the Government rent of $1.00 for the term of the Lease of the Site, receipt whereof is hereby acknowledged.
 (d) The Investor shall have the right to possession of the Site during the term of this Lease ... solely for the purpose of performing his obligations under this Contract.
 (e) The Government hereby assents to the Investor's execution of such mortgage of the Investor's leasehold interest in the Site as may be necessary in connection with financial arrangements entered into by the Investor in furtherance of his undertakings under this Contract.
 Title III, Article 4: At its election ... the Investor shall:
 (b) Execute and deliver a good and sufficient instrument of conveyance in form and substance satisfactory to the Government, conveying the Improvements and the Investor's leasehold interest in the Site to a Trustee satisfactory to the Government to be held in trust in accordance with the provisions of the trust agreement described below,.... (Emphasis added).
 
 
 [8]
 See Title II, Article 4(d), n. 7, supra
 
 
 [9]
 Georgia Code (1933), Sec. 85-803, provides:
 Rights of tenant as to use. Grounds of forfeiture of estate.--An estate for years carries with it the right to use in as absolute a manner as a greater estate, but not to the injury of the property or of the person entitled either in remainder or reversion; the acts of omission and commission prescribed as grounds of forfeiture of an estate for life shall operate as to the same effect as against a tenant for years.
 
 
 [10]
 Title II, Article 5:
 At the request of the Investor, the Government agrees to mortgage to the Investor the Site as further assurance of the Government's performance of its undertakings under this Contract.
 
 
 [11]
 Title III, Article 4(b), n. 7, supra
 
 
 [12]
 Title IV, Article 6:
 Assignments. Pursuant to the provisions of the Assignment of Claims act of 1940, as amended (31 U.S.C. 203, 41 U.S.C. 15), claims for moneys due or to become due from the Government to the Investor under this Contract may be assigned to a bank, trust company, or other financing institution, including any Federal lending agency and may thereafter be further assigned and reassigned to any such institution.