UNITED STATES of America, Plaintiff,

v.

The INCORPORATED VILLAGE OF IS-
LAND PARK, Jacqueline Papatsos, in
her capacity as Mayor of the Incorporat-
ed Village of Island Park, Charlotte
Kikkert, in her capacity as Trustee of
the Incorporated Village of Island Park,
Philip Taglianetti, in his capacity as
Trustee of the Incorporated Village of
Island Park, James Fallon, in his capac-
ity as Trustee of the Incorporated Vil-
lage of Island Park, Michael A. Parente,
James G. Brady, Francis R. McGinty,
Michael Masone, Geraldine McGann,
Daniel McGann, Eileen McGann, Antho-
ny Ciccimarro, Janet Ciccimarro, Joseph
Ruocco, Mary Ellen Guerin, Dennis
Guerin, Joseph DiDomenico, Maria Di-
Domenico, Donna Moore and Kenneth
Moore, Defendants.

No. 90–CV–0992.

United States District Court,
E.D. New York.

May 17, 1995.

Charles S. Kleinberg, Stanley N. Alpert, Richard K. Hayes, Asst. U.S. Attys., Brooklyn, NY, for the U.S.

Frank D. Dikranis, Dikranis & O'Shea, Long Beach, NY, for Geraldine McGann.

James W. Dougherty, James W. Dougherty, P.C., Malverne, NY, for Daniel and Eileen McGann.

Eugene Mittelman, Dreyer & Traub, New York City, for Joseph and Maria DiDomenico, Mary Ellen and Dennis Guerin, Kenneth and Donna Moore and Joseph and Debra Ruocco.

William H. Pauley III, Snitow & Pauley, New York City, for the Incorporated Village of Island Park, Jacqueline Papatsos, Charlotte Kikkert, Philip Taglianetti and James Fallon.

Joseph A. Quatela, Allen R. Morganstern, P.C., Mineola, NY, for Michael Parente, James Brady and Francis McGinty.

Jonathan L. Rosner, Rosner & Goodman, New York City, for Anthony and Janet Ciccimarro.

Milton Thurm, Thurm & Heller, New York City, for Michael Masone.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

This action arose from the administration of a Community Development Block Grant Program ("CDBG Program") and a Section 235 Housing Program and from the alleged misuse of Housing and Urban Development ("HUD") funds in those programs by the Village of Island Park, New York ("Island Park" or the "Village") between 1979 and 1983. The government filed this action on March 22, 1990; it filed an amended complaint on May 8, 1990. The government has named as defendants the Incorporated Village of Island Park and its present Mayor (Jacqueline Papatsos) and trustees (Charlotte Kikkert, Philip Taglianetti and James Fallon), in their official capacities (collectively, the "Village Defendants"); former officials of the Village, including former Mayor Michael Parente ("Parente"), former trustees James Brady ("Brady") and Francis R. McGinty ("McGinty") and former trustee and HUD employee Geraldine McGann; and six of the couples who were awarded Section 235 homes in the Village (the "Homeowner Defendants").

The amended complaint asserted eight causes of action: (1) violation of the False Claims Act, 31 U.S.C. §§ 3729 et seq.; (2) fraud; (3) violation of the Fair Housing Act, 42 U.S.C. §§ 3601 et seq.; (4) breach of fiduciary duty; (5) aiding and abetting breach of fiduciary duty; (6) unjust enrichment; (7) constructive trust; and (8) erroneous payment of funds. Upon defendants' motion for summary judgment dismissing the claims as time barred, this court dismissed the claims for fraud, breach of fiduciary duty and aiding and abetting breach of fiduciary duty in their entirety; dismissed the claims for violation of the False Claims Act, unjust enrichment and erroneous payment of funds to the extent they related to events prior to March 22, 1984; and dismissed the claim for violation of the Fair Housing Act to the extent the government sought civil penalties. *United States v. Incorporated Village of Island Park*, 791 F.Supp. 354 (E.D.N.Y.1992) (*Island Park*). The underlying facts and circumstances are set out in that opinion, familiarity with which is assumed.

The government now moves for partial summary judgment against the Village Defendants, Parente and Brady on the remaining False Claims Act and Fair Housing Act causes of action; against the Homeowner Defendants (excluding the Ruoccos) on the unjust enrichment and constructive trust claims; and against the Village Defendants, Parente, Brady and the Homeowner Defendants (other than the Ruoccos) for erroneous payment of funds.

The Village Defendants have cross-moved for summary judgment dismissing the causes of action for False Claims Act violations and erroneous payment of funds and have moved for additional time to conduct discovery with respect to the government's claim under the Fair Housing Act. Parente, Brady and McGinty have adopted the Village Defendants statement of facts and memoranda of law and have also moved to dismiss the causes of action for False Claims Act violations and erroneous payment of funds, as well as for additional time to conduct discovery on the Fair Housing Act claims. The Homeowner Defendants have moved for summary judgment dismissing all remaining claims against them.

### *Preliminary Matters*

Pursuant to Local Civil Rule 3(g), the government has submitted a Statement of Material Facts as to which it contends there is no genuine issue to be tried. Several of the contentions in the government's 3(g) statement relate to matters with respect to which defendants Daniel McGann and James Brady asserted their Fifth Amendment privilege against self-incrimination at deposition. Those defendants now attempt to controvert those contentions by submitting affidavits in opposition to the government's motion for summary judgment. The government has requested that those affidavits be stricken. Thus, prior to determining whether the undisputed material facts in this action warrant summary judgment, this court must determine whether to admit those affidavits.

■ The privilege against self-incrimination may be invoked by defendants in civil as well as criminal proceedings and during the discovery process as well as during trial.

Because of the potential for abuse of the privilege by defendants who use it to obstruct discovery only to waive it and subject the plaintiff to surprise testimony at trial, the courts recognize the appropriateness of imposing sanctions for a civil defendant's assertion of the privilege during discovery. Thus, a decision to assert the privilege during pretrial depositions may be valid grounds for precluding a defendant from testifying at trial, *Gutierrez–Rodriguez v. Cartagena*, 882 F.2d 553, 575–77 (1st Cir.1989), as well as for striking affidavits opposing summary judgment motions, *In re Edmond*, 934 F.2d 1304, 1308–09 (4th Cir.1991); *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir.).

■ This principle has been accepted by several district courts in this circuit, *SEC v. Drexel Burnham Lambert Inc.*, 837 F.Supp. 587, 606 n. 6 (S.D.N.Y.1993), *aff'd on other grounds*, 16 F.3d 520 (2d Cir.1994); *United States v. Certain Real Property and Premises Known as 4003–4005 Fifth Avenue*, 840 F.Supp. 6 (E.D.N.Y.1993); *United States v. Talco Contractors, Inc.*, 153 F.R.D. 501, 506 (W.D.N.Y.1994); *SEC v. Cymaticolor Corp.*, 106 F.R.D. 545, 549–50 (S.D.N.Y.1985); *SEC v. Benson*, 657 F.Supp. 1122 (S.D.N.Y.1987), and is consistent with the well-settled principle that a defendant's direct testimony should be stricken if he or she invokes the Fifth Amendment on cross-examination to shield that testimony from scrutiny, *Bagby v. Kuhlman*, 932 F.2d 131, 135 (2d Cir.1991), *cert. denied*, 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 281 (1991); *Klein v. Harris*, 667 F.2d 274, 289 (2d Cir.1981) (citing *Brown v. United States*, 356 U.S. 148, 154–57, 78 S.Ct. 622, 626–28, 2 L.Ed.2d 589 (1958)).

■ In view of Brady's and McGann's repeated invocation of their Fifth Amendment privilege at deposition, their "eleventh hour" attempt to avoid the consequences of asserting that privilege by submitting affidavits in opposition to the government's summary judgment motion constitutes an abuse of the discovery procedure which should not be permitted. Accordingly, the affidavits of Brady and McGann are precluded.

■ Furthermore, the government may rely on the defendants' assertion of their

Fifth Amendment privilege to confirm matters supported by other independent evidence. As this court has previously held, an adverse inference may be drawn in a proceeding against a defendant who invokes the privilege against self-incrimination. *United States v. Private Sanitation Industry Association*, 811 F.Supp. 808, 812 (E.D.N.Y.1992), *aff'd* 995 F.2d 375 (2d Cir.1993) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976)). However, liability should not be imposed based solely upon the adverse inference. *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 683 F.Supp. 1411, 1452 (E.D.N.Y.1988) (citations omitted), *aff'd*, 879 F.2d 20 (2d Cir.1989). The government must produce "independent corroborative evidence of the matters to be inferred" before liability will be imposed. *Id.*

### Facts

■ The Village joined the Nassau County Consortium, which was formed to participate in the "Nassau County Community Development Program pursuant to Title I of the Housing and Community Development Act of 1974, as amended." Pl's 3(g) St. ¶ 7. The Secretary of HUD approved the Consortium's application for a Community Development Block Grant (CDBG) to finance a community development program for the Village. *Id.* CDBG funds may be used for such things as acquiring real property, site improvement, and building public works and playgrounds, but not for the construction of new housing or to provide housing assistance or subsidies for occupants. 42 U.S.C. §§ 5305(a)(1), (2), (4) *et seq.;* 24 C.F.R. § 570.207(b)(3). A unit of local government is eligible to receive CDBG funds only if it certifies to HUD that it is following a current housing assistance plan (HAP) that meets certain statutory requirements. 42 U.S.C. § 5304(c)(1). The unit of local government is required to facilitate achieving the goals for assisted housing in the HAP. 24 C.F.R. § 570.903(e)(2).

The Village entered into Cooperation Agreements with Nassau County, pursuant to which it agreed that the County would allocate CDBG funds "according to a formula based on population and need in conformance to goals and objectives of the application [for CDBG funds]." Cooperation Agreements (Exhibit 2 in Support of Plaintiff's Motion) ¶ 9; Plaintiff's Analysis of Material Facts Not in Dispute ("Pl's Analysis"), at 8, fn. 8. The Village also agreed that the County had sole responsibility for "the analysis of needs, the setting of objectives, the development of community development and housing assistance plans...." and that the parties would comply with Title VI of the Civil Rights Act of 1964. Pl's 3(g) St. ¶¶ 9, 11; Cooperation Agreements ¶¶ 2, 10. The parties agreed that "no person shall on the ground of race, color, sex or national origin be excluded from participation in, be denied the benefits or, or otherwise be subjected to discrimination under any program or activity for which the parties receive federal financial assistance ..." Pl's 3(g) St. ¶ 11; Cooperation Agreements ¶ 2.

■ As part of its HAP, the County initiated a Section 235 housing program on scattered sites throughout the County, including the Village. Pl's 3(g) St. ¶ 10. Under Section 235 of the National Housing Act, HUD assists low income purchasers of homes by insuring their mortgages against default and by making a portion of their monthly mortgage payments. 12 U.S.C. § 1715z(i), (a). The housing is built by a private developer who obtains mortgage commitments from a HUD-approved lender. A developer who applies to build Section 235 housing in a community with a HUD-approved HAP will be approved only if the application is consistent with the HAP. 24 C.F.R. § 235.39(a). Upon HUD approval, Section 235 funding sufficient to subsidize the mortgages on the proposed houses is reserved for the ultimate purchasers.

■ Under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, it is illegal to discriminate based upon race in the provision of housing. HUD has an affirmative obligation to administer its housing assistance programs to further the purposes of the Fair Housing Act. 42 U.S.C. § 3608(e)(5). HUD regulations therefore require that HUD-assisted dwelling units must be affirmatively marketed to "achieve a condition in which

individuals of similar income levels in the same housing marketing area have a like range of housing choices regardless of race." 24 C.F.R. § 200.610. Applicants for HUD assistance are required to file for approval an affirmative fair housing marketing plan (AFHMP) on a form provided by HUD. 24 C.F.R. § 200.625. That form requires the applicant to set forth racial goals, which it is required to make a good faith effort to achieve.

The Village received approximately $650,-000 in federal CDBG funds from the County, which it used to purchase or improve land for sale to builders who thereafter applied to HUD to reserve Section 235 funds for the ultimate purchasers of the homes. Pl's 3(g) St. ¶¶ 12, 13; Village Defendants' Counter–Statement, at 6. A county-wide AFHMP filed by Nassau County contemplated "a concentrated outreach to attract those families who might not traditionally be expected to purchase a home in a given area" and stated that "[p]roposed housing in non-minority areas will be marketed aggressively to minority groups." Pl's 3(g) St. ¶ 16.

Forty-four homes were built in the Village under the Section 235 program. The homes were built in three phases, commencing in 1979: Phase I consisted of five homes which were constructed by the Halandia Group; Phase II consisted of 22 homes, and Phase III consisted of 17 homes constructed by Ocean Park Properties. Pl's 3(g) St. ¶ 14; Village Defs' Counter–St. ¶ 17, at 7. In its 1981 guidelines for homeowner selection for the Section 235 program, the Village recognized "the obligation to take care of our own qualified residents [as] the first and foremost reason for the building of subsidized housing in the Village." Pl's 3(g) St. ¶ 14.

The AFHMP which was approved for Phase I of the Section 235 program in the Village was prepared by the County. Pl's 3(g) St. ¶ 17. In the AFHMP, it was represented that the program would be advertised locally as well as in Long Beach community newspapers to "offer outreach to broader spectrum of citizens in the specific target area, including the minority population with-in the adjacent Long Beach community." *Id.* The Phase I AFHMP, which was submitted by Halandia, set forth the anticipated occupancy goals as "four whites" and "one black or hispanic." Pl's 3(g) St. ¶ 15. In its February 14, 1980 letter approving the AFHMP, HUD stated that "[t]he selecting or giving of preference to prospective purchasers in order to achieve projected goals is not permitted. Transactions should be entered into on a first-come-first-serve basis. The principal standard applied in determining compliance with the Affirmative Fair Housing Marketing Plan is diligent good faith effort." Pl's 3(g) St. ¶ 18.

According to the 1970 census, the Village had a population of 5,396 of which 75 were black; in 1980, the Village's population was 4,387, with 23 blacks constituting .47% of its population; in 1990, the Village had a population of 4,810 with 30 blacks, or 0.6% of its population. Pl's 3(g) St. ¶ 1. The black population of the entire Nassau County Consortium was 9.5% in 1980. *Id.* Although the Village Defendants assert that these census figures are inaccurate, they have not submitted any evidence in support of their assertions.[1]

Michael A. Parente was Mayor of the Village from 1968 until 1990 and James G. Brady was a trustee of the Village from 1966 until 1990. Pl's 3(g) St. ¶¶ 2–3. Harold Scully ("Scully") was Village Clerk from 1955 to 1986 and served as Village Clerk during the entire time that the HUD Section 235 program was being administered in the Village. Pl's 3(g) St. ¶ 4. The government contends that Scully was responsible for administering the Section 235 program in the Village; the Village Defendants do not deny that Scully administered the Program but contend that private builders bore responsibility for its administration. Pl's 3(g) St. 5; Village Def's Counter–Statement, at 4–5. Ann Leonard was Deputy Village Clerk from 1976 to 1986, and is currently Village Clerk. Pl's 3(g) St. ¶ 6.

Scully testified that Village Trustee Daniel Kikkert (now deceased) and Brady expressed

---

1. The 1980 census figures submitted by the government with its reply papers indicate that the black population of the Village was non-existent. *See* Pl's Analysis, at 6 fn 2.

concern about the Village participating in the Section 235 program "because there was a potential for blacks being brought into the community" and they wanted to ensure that blacks would be excluded. Pl's 3(g) st. ¶ 19.[2] Scully testified that he did not intend to give houses to persons who lived outside the Village and, rather than distributing the homes on a first-come, first served basis as required by HUD, he or his staff called five pre-selected persons prior to the appearance of advertising of the Phase I homes to ensure that "they got their letters in first" and to "subvert the process that HUD had required with regard to the advertisements." Pl's 3(g) St. ¶ 22. Leonard confirms that people were informed of the advertisement in March 1980, prior to its appearance, and that she placed three of the calls including a call to Anthony Ciccimarro. Pl's 3(g) St. ¶ 23. The Village admits that Scully used the HUD housing program to confer benefits on his special friends and family. Pl's 3(g) St. ¶ 24.

Scully testified that he understood that under the selection process required by HUD, the Village could accept letters from persons interested in the program only after an advertisement for the housing program appeared. Pl's 3(g) St. ¶ 25. The preselected persons, including the Ciccimarros, delivered their application letters to Village Hall before or at 9 a.m. of the day they had been told the newspaper ads would appear for Phase I. Pl's 3(g) St. ¶¶ 26, 27.

The Ciccimarros do not deny that they were called and notified before the advertisement was to appear or that they delivered their application before 9 a.m. on the date that the newspaper ad was scheduled to appear. Janet Ciccimarro asserts that the Ciccimarros were economically qualified for the HUD mortgage, that the application for the program was truthful and that she and her husband were unaware of the Village officials' intent to "manipulate availability of housing" to "[d]efraud the United States and HUD" of "money and the right to have the Program administered fairly and honestly"

or to exclude blacks and Hispanics from housing in the Village. Aff. of J. Ciccimarro, ¶¶ 3A, B. Michael DeLessio, a former Village employee has submitted a declaration asserting that in the fall of 1979, Anthony Ciccimarro told DeLessio that he had spoken to his cousin Alfonse D'Amato and that D'Amato was getting him a Section 235 house in the Village. Pl's 3(g) in Opp. ¶ 7; Delessio Decl. ¶ 4. (The government has also submitted Scully's testimony that D'Amato told him to give the Ciccimarros a house and that he adjusted his list of participants to include the Ciccimarros after discussing that request with Mayor Parente. Pl's Counter–3(g) St. ¶ 3.)

Between Phase I and Phase II, Scully interviewed between 50 and 100 persons for Section 235 homes, none of whom were black. Pl's 3(g) St. ¶ 29. Scully told interested individuals from outside the Village that they were not eligible for the program. Id.

An AFHMP for Phase II was submitted by Ocean Park Properties to HUD on September 14, 1981. Pl's 3(g) St. ¶ 30. In a cover letter submitted with the AFHMP, which was prepared by the County, the County certified that the anticipated occupancy goals were consistent with those of the County-wide AFHMP for Section 235 housing. Id. The anticipated occupancy goals for Phase II were 3 whites, 17 blacks and 4 Hispanics. The County-wide AFHMP stating that proposed housing in non-minority areas would be aggressively marketed to minority groups, was enclosed as part of the Phase II AFHMP. Id. The AFHMP also indicated that advertisements would be placed in the Independent Voice and the Amsterdam News to "provide outreach to areas ... including the minority population within the adjacent community of Long Beach" and that the "goals for anticipated occupancy for minorities in the Section 235 housing in the Incorporated Village of Island Park are greater than the averages of the Village and County." Id. The AFHMP also

---

2. Brady asserted his Fifth Amendment privilege when questioned about these allegations at deposition and, in his affidavit submitted in opposition to the government's motion, denies these assertions. See Village Def's Counter–3(g) St. at

9. However, this court has determined that Brady's affidavit must be precluded because of his abuse of the discovery process. See discussion, supra.

provided for meetings with community organizations such as the Hempstead offices of the NAACP and the Alliance of Minority Group Leaders, Inc. *Id.*

In its letter approving the Phase II AFHMP, HUD restated its position that the occupancy estimates were goals, not quotas and reiterated that transactions must be entered into on a first-come first served basis. Pl's 3(g) St. ¶ 31.

Minutes of a November 12, 1981 meeting of the Village Board state that "The Mayor reported that the Village was accepting letters from those interested in the Section 235 Housing Project." Pl's 3(g) St. ¶ 32; Village Def's Counter–St. ¶ 29, at 13. The advertisements for both Phase I and Phase II directed persons interested in the Section 235 program to write to the Village at Village Hall. *Id.*

Scully testified that he selected Phase II purchasers by contacting 22 persons from a pre-selected list on November 18, 1981, before advertisements for Phase II first appeared. Pl's 3(g) St. ¶ 32. Ann Leonard confirmed that on November 18, she heard Scully telling people that an advertisement would appear in Newsday and that they should bring a letter in the next day. Pl's 3(g) St. ¶ 33. Scully testified that the purpose of calling persons before the ad appeared was to ensure that the persons who were on the final list of pre-selected purchasers would receive a home. Pl's 3(g) St. ¶ 34. The Village Defendants do not deny Scully's actions but maintain that they were "unaware of Scully's manipulation of the Section 235 Program" and that his acts were not authorized or ratified by the Village or any trustee. Village Defs' Counter–St. ¶ 41, at 14. Twenty-two letters were stamped received at Village Hall at 9:00 a.m. on November 19, 1981. Pl's 3(g) St. ¶ 35.

Scully testified that Brady arranged to have his niece and her husband, the Guerins,

put on the list of pre-selected purchasers. Pl's 3(g) St. ¶ 36. Brady invoked the Fifth Amendment when questioned about this at his deposition.[3] *Id.* The Guerins were among those whose letters were date-stamped by Ann Leonard on November 18, 1981 as having come in before 9:00 a.m. *Id.*

Scully testified that the Moores and DiDomenicos were also on the final list of twenty-two, and that they were telephoned on November 18, 1981. P's 3(g) St. ¶¶ 37, 38. Both the Moores' and the DiDomenicos' letters were date-stamped by Ann Leonard on November 19, 1981 as having come in before 9:00 a.m. *Id.* Scully testified that Mayor Parente left a note in his own handwriting requesting that Trustee McGinty's sons be included in the final list and that one of McGinty's sons was called on November 18. Pl's 3(g) St. ¶ 39. Although the Village Defendants deny certain of these assertions relating to the existence of a list of pre-selected applicants and assert a lack of awareness as to Scully's activities, the Village Defendants have not submitted any affidavits or other supporting evidence in support of their position.[4] Neither have the Homeowner Defendants who purchased Phase II houses specifically denied Scully's activities; they have instead denied knowledge of the "alleged manipulation of the availability of Section 235 housing in Island Park." Aff. of M. Guerin ¶ 5, Aff. of J. DiDomenico ¶ 5, Aff. of D. Moore ¶ 4. Nor do the Homeowner Defendants deny being called in advance of the appearance of the newspaper ads or delivering their application letters to Village Hall by 9:00 a.m. on November 19, 1981; rather, they deny being told prior to November 19, 1981 that they "would receive" a Section 235 house or that they "would be selected" to receive such housing. *Id.* They also deny being advised of the "availability" of the Phase II housing prior to the general public. *Id.* Although the Homeowner Defendants assert

---

**3.** Although Brady, in his affidavit submitted in opposition to the government's motion, denies these assertions, this court has determined that Brady's affidavit must be precluded because Brady had asserted his Fifth Amendment privilege with respect to this matter during his deposition. *See* discussion, *supra.*

**4.** The only supporting affidavit submitted by the Village Defendants is that of former Trustee Brady, which this court has precluded. In any case, the only specific assertion made in that with respect to the allocation of the Section 235 homes relates to his role in obtaining a home for the Guerins.

that they (or in the case of Moore, her father) read the newspaper ad, they do not assert having read that ad prior to delivering their application letters to Village Hall. Aff. of M. Guerin ¶ 3; Aff. of J. DiDomenico ¶ 4; Aff. of D. Moore ¶ 3.

In response to the Homeowner Defendants' (including the Ruoccos) motion for summary judgment dismissing the complaint against them, the government has submitted additional materials to refute the assertions of lack of knowledge.[5] The declaration of Michael DeLessio attests to a conversation in the fall of 1979 in which Ruocco told him that he was getting a Section 235 house in the Village. Pl's 3(g) St. in Opp. ¶ 22; DeLessio Decl. ¶ 3. DeLessio also attests that he saw Brady and the Guerins looking at the site where their Phase II house was eventually built on at least one occasion prior to November 1981, Pl's 3(g) St. in Opp. ¶ 24, and that both DeLessio and Joseph DiDomenico were promised Phase II houses by Masone approximately three months prior to November 1981. Pl's 3(g) St. in Opp. ¶ 26. DeLessio attests that Masone told him and DiDomenico that they would be informed before the ad would appear and, sometime between November 16 and November 18, 1981, they were informed by Scully that the ad would appear on November 19 and they should put their letters of interest in the mail slot before 9:00 a.m. Pl's 3(g) in Opp. ¶ 27. DiDomenico and DeLessio slipped their letters into the mail slot at Village Hall at approximately 6:00 a.m. on November 18, at which time DeLessio saw through the mail slot that there were other letters on the floor. Pl's 3(g) St. in Opp. ¶ 28. DeLessio also attests that his wife called Joseph DiGiacomo, Donna Moore's father, prior to November 19, 1981 to inform him that they were getting a Section 235 house and suggested that he speak to Masone about getting a house for his daughter. Pl's 3(g) in Opp. ¶ 29. DiGiacomo told DeLessio that after all he had done for the Village the Village should give his daughter a house. Id.

No AFHMP was submitted to HUD for Phase III, and the availability of Phase III homes was not advertised by the Village. Pl's 3(g) St. ¶ 41. According to Scully's testimony, the Village was advised of the need to act quickly because the program was about to expire and it was suggested that the Village select Phase III purchasers from the unsuccessful applicants for Phase II. Id. Although there were an insufficient number of qualified Village residents who had applied during Phase II to fill the Phase III houses, Scully refused to consider or contact non-Village residents who had applied during Phase II. Pl's 3(g) St. ¶¶ 42–43. Instead, the Village Board and Scully let people know about the availability of Section 235 housing. Pl's 3(g) St. ¶ 44.

The McGanns did not apply for Section 235 housing during Phase II, but Geraldine McGann allegedly used her influence to get a house for her son during Phase III. Pl's 3(g) St. ¶¶ 45–46. Scully testified that Mrs. McGann reviewed and approved the list of Phase III purchasers, which included her son. Pl's 3(g) in Opp. ¶ 16. When questioned about his mother's use of influence to get him a Section 235 house and his knowledge of that influence at deposition, Daniel McGann asserted his privilege against self-incrimination. Pl's 3(g) in Opp. ¶ 17. Geraldine McGann also asserted her Fifth Amendment privilege when she was questioned about whether she discussed the section 235 program with her son. Id.

The Village Defendants question Scully's credibility and dispute the allegations relating to impropriety in the selection of Phase III homeowners generally, but do not submit any supporting affidavits. Village Def's Counter–St. ¶¶ 49–51. Daniel McGann has submitted an affidavit in which he asserts that Scully's deposition testimony is suspect

5. The Ruoccos received a Section 235 house in Phase I. The government has not moved for summary judgment against the Ruoccos. Joseph Ruocco, in his affidavit, admits that he participated in Phase I and that he was told that if he submitted a letter of interest to the Village he would be considered for one of these homes. Ruocco Aff. ¶ 4. Ruocco denies knowledge of the alleged manipulation of the Section 235 program and asserts he was not advised that he "would receive" or "would be selected to receive" Phase I Section 235 housing" prior to March 26, 1980. Ruocco Aff. ¶ 5. Ruocco submitted his application letter on March 26, 1980 after the Phase I advertisement appeared. Pl's 3(g) in Opp. ¶ 22.

and that Scully is motivated to lie because of hostility toward Geraldine McGann. However, McGann does not specifically deny that his mother used her influence in obtaining a home for him. Furthermore, McGann's affidavit has been precluded because of his abuse of the discovery process. *See* discussion, *supra.*

It is undisputed that no blacks received any of the forty-four homes constructed in Island Park under the Section 235 Program. Pl's 3(g) St. ¶ 49.

### *Discussion*

### I. *Summary Judgment Standards.*

Summary judgment "shall be rendered forthwith if ... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In order for the moving party to be successful, it must "point[ ] out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In opposing a properly supported summary judgment motion, "an adverse party may not rest upon the mere allegations or denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). The non-movant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of factual issues [pertaining to immaterial facts] will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

"The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. In deciding a summary judgment motion, the court need not resolve disputed issues of fact, but need only determine whether there is any genuine issue to be tried. *Eastman Mach. Co., Inc. v. United States,* 841 F.2d 469, 473 (2d Cir.1988). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The nonmoving party, therefore, must come forward with facts, and not doubts as to the veracity of the moving party's allegations: "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

### II. *False Claims Act.*

### A. **Village Defendants' Liability for Scully's Acts.**

■ The government's assertion of the Village's liability under the False Claims Act is based in large part on Scully's actions in administering the Section 235 program. The Village's liability for Scully's activities is premised on the principles of agency. A principal is liable even for criminal acts of an agent if those acts are within the scope of his actual or apparent authority. *United States v. Twentieth Century Fox Film Corp.,* 882 F.2d 656, 660 (2d Cir.1989), *cert. denied,* 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 741 (1990); *United States v. Bi–Co Pavers, Inc.,* 741 F.2d 730, 737 (5th Cir.1984).

■ An agent's acts are within the scope of his actual authority if "it is the kind of work he is employed to perform, occurs within the authorized limits of time and space, and is actuated, at least in part, by a purpose to serve the master." W. Prosser, *Torts* § 70 at 461 (4th ed. 1971). Apparent authority is the authority which outsiders would normally assume the agent to have, judging from his position with the corporation and the circumstances of his conduct. *United States v. Bi–Co Pavers, Inc.,* 741 F.2d at 737; *see also* Restatement of Agency 2d, § 49, Comment c ("Acts are interpreted in

the light of ordinary human experience. If a principal puts an agent into, or knowingly permits him to occupy, a position in which according to the ordinary habits of persons in the locality, .. it is usual for such an agent to have a particular kind of authority, anyone dealing with him is justified in inferring that he has such authority ...")

 The doctrine of respondeat superior applies to the Village, an incorporated entity under the laws of the State of New York, *see* N.Y. *Village Law,* §§ 2–232, 234 (McKinney 1973). *See Haehl v. Village of Port Chester,* 463 F.Supp. 845, 848 (S.D.N.Y. 1978); *Marr v. Rife,* 503 F.2d 735, 740 (6th Cir.1974). Respondeat superior applies to violations of the False Claims Act committed by an employee of a corporation who is acting within the scope of his authority and, at least in part, for the employer's benefit. *See Grand Union Co. v. United States,* 696 F.2d 888, 891 (11th Cir.1983); *United States v. Hangar One, Inc.,* 563 F.2d 1155, 1158 (5th Cir.1977). A corporation is also liable for violations of the False Claims Act committed by an employee who acted with apparent authority, even if the acts do not benefit the corporation at all. *United States v. O'Connell,* 890 F.2d 563, 567–68 (1st Cir.1989).

Although the Village Defendants deny awareness of Scully's manipulation of the Section 235 Program and assert that his acts were not authorized or ratified by the Village or any of its Trustees, they do not deny that the administration of the Section 235 Program by Scully was within the scope of his duties. Scully was duly appointed Village Clerk, and in that capacity was Secretary to the Village Board and took care of the Village's day-to-day business. Pl's 3(g) St. ¶ 4. The acts on which the government bases its cause of action under the False Claims Act were performed by Scully at Village Hall during business hours. The government has demonstrated that the Village was actively involved in the Section 235 program. The land on which the houses were built was purchased and improved by the Village with CDBG funds, eligibility and selection criteria were adopted by the Village Board and applications for Section 235 housing were addressed to Village Hall. Pl's 3(g) St. ¶¶ 12–

14, 32. The Village recorded in its official minutes the Mayor's report that the Village was accepting applicants for Section 235 housing. Pl's 3(g) St. ¶ 32. In addition, the program was part of the County Consortium's HAP and the Village, as a Consortium member and sub-grantee of CDBG funds, had agreed to cooperate with the Consortium in providing subsidized housing. Pl's 3(g) St. ¶¶ 9–11. The Village Board explicitly recognized that the Section 235 program would benefit Village residents. Pl's 3(g) ¶ 14.

 Furthermore, although the Village Defendants assert that Scully's illegal acts were not authorized, they do not submit any evidence that Scully's authority to administer the Section 235 Program was contested by the Village or any of its officers. In fact, the evidence indicates that Parente was willing to take credit for the Program and accepted a gift that the Section 235 homeowners gave him in appreciation of his involvement. Pl's 3(g) St. ¶ 48. Thus, Scully's acts were of the kind he was employed to perform, occurred within the authorized limits of time and space, and were intended at least in part to benefit the Village. Accordingly, those acts were within the scope of his actual authority and, under principles of respondeat superior, can form the basis for the Village's liability under the False Claims Act.

 Moreover, it is clear that Scully's administration of the Section 235 Program was consistent with his position and within the scope of his apparent authority. Advertisements that were submitted to newspapers by Scully as Village Clerk directed interested applicants to write to the Village at Village Hall. Pl's 3(g) St. ¶ 32. In interviewing potential applicants for the Section 235 Program and responding to complaints about the administration of the Program on behalf of the Village Board, Scully was performing acts which third parties would normally assume to be within the scope of his authority. Pl's 3(g) St. ¶ 51. In his correspondence with HUD in response to its request from the Village for information about the marketing of the Section 235 homes, Scully used Village stationery and held himself out as acting on behalf of the Village. Pl's 3(g) St. ¶ 50. These acts were consistent with his

position as Village Clerk and would justify the inference that he was acting within the scope of his authority. Thus, these acts can be used to establish violations of the False Claims Act by the Village.

### B. Violations of False Claims Act: the Village Defendants.

The False Claims Act, 31 U.S.C. § 3729, *et seq.*, provides that a person is liable if he, inter alia:

(1) Knowingly presents or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ...

31 U.S.C. § 3729(a).

The government contends that the Village Defendants, Parente and Brady are each liable for separate False Claims Act violations for each post-March 22, 1984, claim by the Village for CDBG funds which were used in connection with the Section 235 program and for each monthly claim for a mortgage subsidy on behalf of each of the Section 235 purchasers.

The provisions of the False Claims Act are to be read broadly and "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. McLeod*, 721 F.2d 282, 284 (9th Cir.1983) (quoting *United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1968)). Thus, the statute is violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a fraudulent course of conduct that causes the government to pay a claim for money. *See Scolnick v. United States*, 331 F.2d 598, 599 (1st Cir.1964), finding liability under the False Claims Act for cashing a check mistakenly issued to defendant for an obligation that had been satisfied;

*United States v. McLeod*, 721 F.2d at 283–284, finding liability for presenting for payment a check which the defendant knows he is not entitled to. The legislative history indicates that the False Claims Act was intended to cover "each and every claim submitted ... by means of false statements, or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation ..." S.Rep. No. 345 at 9, *reprinted* in 1986 U.S.Code Cong. and Admin.News, 5266, 5274.

A bid-rigging scheme, in which contractors who are supposed to compete against each other to submit the lowest bid conspire to artificially fix the low bid and the bidder who will be awarded the contract is a fraudulent course of conduct which can give rise to False Claims Act violations. *United States ex. rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Thus, claims for payment submitted under the rigged contract constitute false claims within the meaning of the False Claims Act. *See United States v. CFW Construction Co., Inc.*, 649 F.Supp. 616, 618 (D.S.C.1986), *dismissed*, 819 F.2d 1139 (4th Cir.1987).

Furthermore, the government need not prove an intent to defraud, but only that the violations were committed knowingly, that is with willful blindness to the existence of a fact or reckless disregard for the truth. *United States v. Foster Wheeler Corporation*, 316 F.Supp. 963, 967 (S.D.N.Y.1970), *modified on other grounds*, 447 F.2d 100 (2d Cir.1971); *United States v. Sarantos*, 455 F.2d 877, 881 (2d Cir.1972).

The fraudulent pre-selection scheme that Scully testified to and that the Village Defendants have failed to refute clearly constitutes the type of fraudulent conduct which the False Claims Act was intended to reach. Scully's testimony indicates that the Village intentionally failed to follow the prescribed scheme for awarding Section 235 housing. Thus, Scully, knowing that it was improper and illegal, pre-selected the purchasers of the Phase I and Phase II houses by giving them advance notice of when the program was to be advertised and by telling them to deliver their letters to Village Hall prior to 9:00 a.m.

on the day in question. Pl's 3(g) St. ¶¶ 22–23, 26–28, 32–39. The Section 235 purchasers, so selected, were chosen in violation of the conditions on which the program was approved—that is, that the purchasers be approved on a first-come, first-served basis, and that a diligent good faith attempt to comply with the AFHMP would be made in administering the program. The Phase III purchasers were also selected by the Village in a manner that prevented qualified Village non-residents from receiving those homes, thereby subverting the goals of the County's AFHMP. No AFHMP was filed for Phase III and qualified Village non-residents who had applied during Phase II were not notified of the availability of Section 235 houses under Phase III. Pl's 3(g) St. ¶¶ 41–43.

It is consistent with the generally broad reading that the courts have applied to the False Claims Act to find the fraudulent scheme for administering the Section 235 program in the Village within the purview of the Act. In *United States v. Shaw*, 725 F.Supp. 896 (S.D.Miss.1989), cited by the Village Defendants, the court held that a bribery scheme could not form the basis for a cause of action under the Act. That case appears to be an anomaly and it is the better view to reject such a restrictive reading of the False Claims Act. *See United States v. McLeod*, 721 F.2d at 285.

Furthermore, the government has pointed to numerous false statements made by the Village as a basis for finding False Claims Act violations. The Village stated in the Cooperation Agreement that it was required to sign in order to receive CDBG funds that "no person shall on the ground of race, color, sex, or national origin be excluded from participation in ... any program ... for which [the Village] receive[s] federal financial assistance and [the Village] will at all times take any measure necessary to effect this agreement," Pl's 3(g) St. ¶ 11, and marketed the Section 235 homes to ensure that no blacks would receive houses. Pl's 3(g) St. ¶ 19. The Village also stated that it would cooperate in the County's housing assistance activities, which included attempts to desegregate the County; despite Scully's awareness of those statements, he thwarted the goals for

minority occupancy in the Village that were set forth in the AFHMP. Pl's 3(g) St. ¶ 11. Scully also wrote a letter to HUD in which he falsely stated, with the intent of misleading HUD, that the Village had used a "first-come, first-served selection process" in choosing recipients of the Phase II homes. Pl's 3(g) St. ¶ 51. Additional false statements were made by the Village in a letter signed by Scully for Parente regarding the Village's efforts to contact Phase II applicants in making selections for Phase III. Pl's 3(g) St. ¶ 52. Thus, the Village's fraudulent conduct caused false claims to be presented to the government by the innocent mortgagee on behalf of purchasers who were illegally selected in violation of the first-come, first-served requirements. 31 U.S.C. § 3729(a)(1), (a)(2).

Fraudulent conduct and false statements remain inchoate until a claim for payment causing the government to disburse funds is made. *United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 952–53, 2 L.Ed.2d 1001 (1958). The false statements or fraudulent conduct emerge "in full vigor" and become "a part of the claim as finally paid by the Government ..." when that claim is filed with the government. *United States v. Klein*, 230 F.Supp. 426, 442 (W.D.Pa.1964), *aff'd*, 356 F.2d 983 (3rd Cir. 1966).

The allocation of the Section 235 houses pursuant to the fraudulent course of conduct described above resulted in the approval of HUD-subsidized mortgages with respect to those houses. When claims for payment on those mortgages are submitted by the innocent mortgagees, the fraudulent course of conduct pursuant to which the mortgages were approved emerge in "full vigor" and become a part of those claims, which therefore constitute false claims within the meaning of the False Claims Act. It is irrelevant that Lend–Mor, the lender who submitted the claims for mortgage subsidies is totally innocent. *United States ex rel. LaValley v. First National Bank of Boston*, 707 F.Supp. 1351, 1352 (D.Mass.1988); *United States v. Goldberg*, 256 F.Supp. 540, 541–42 (D.Mass.1966); *United States v. Stillwater Community Bank*, 645 F.Supp. 18, 19

(W.D.Okla.1986); *United States v. Ehrlich,* 643 F.2d 634 (9th Cir.) *cert. denied,* 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981).

■■■ Furthermore, a separate claim for liability under the False Claims Act exists with respect to *each* monthly mortgage subsidy claim submitted by Lend–Mor. In *United States v. Ehrlich, supra,* the Ninth Circuit held that each monthly demand for payment submitted to HUD by an innocent mortgagee constituted a separate False Claims Act violation, where the underlying contract was entered into based on defendant's misrepresentations. This holding was implicitly adopted by the Second Circuit in *U.S. ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1157 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). In *Kreindler,* the court held that the number of assertable False Claims Act claims is measured by the number of fraudulent acts committed by the defendant. In support of this proposition the *Kreindler* court quoted *Ehrlich,* 643 F.2d at 638 ("if a person knowingly causes a specific number of claims to be filed, he is liable for an equal number of forfeitures"), as well as *United States v. Bornstein,* 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

The Village Defendants argue that the *Kreindler* court's reliance on *Bornstein* compels a conclusion that the demand for mortgage subsidies are not claims within the meaning of the False Claims Act. This reading of *Bornstein* is incorrect. In *Bornstein,* a subcontractor had supplied defective radio tubes to a prime contractor who was supplying radios to the government. The tubes, which were supplied under three invoices, were used to assemble radio kits which the prime contractor then supplied to the government under thirty-five invoices. In holding that the subcontractor could only be liable for three, rather than thirty-five, violations of the False Claims Act, the Supreme Court noted that the number of claims submitted by the prime contractor was "completely fortuitous and beyond [the subcontractor's] knowledge or control." 423 U.S. at 312, 96 S.Ct. at 529. Thus, *Bornstein* did not recharacterize the invoices submitted by the innocent prime contractor as something oth-

er than claims, but limited the number of penalties to which the subcontractor could be liable as a result of those claims.

Furthermore, the reasoning of *Bornstein* is inapplicable in determining the number of False Claims Act violations in the instant case in which the fraudulent conduct and false statements of the Village caused the innocent mortgagee to submit a readily ascertainable number of claims for mortgage payments. The facts in this case parallel those in *Ehrlich,* in which the defendant's original fraudulent act caused HUD to enter into a contract with an innocent mortgagee, pursuant to which HUD was required to pay monthly mortgage subsidies. The Ninth Circuit explained:

> [Bornstein] suggests that, if a person knowingly causes a specific number of false claims to be filed, he is liable for an equal number of forfeitures. In the absence of such knowledge, using the number of claims to determine the number of forfeitures would be arbitrary. Where such knowledge is present, however, it is consistent with the purposes of the Act to impose forfeitures based on the number of claims.

643 F.2d at 638.

*Kreindler* adopts the Ninth Circuit's interpretation of *Bornstein,* quoting the very language which compels the conclusion that the Village Defendants are liable for a separate False Claims Act violation for each claim for a mortgage subsidy which the innocent mortgagee submitted as a result of the Village's fraudulent conduct, notwithstanding the Village Defendants' attempt to recharacterize those claims as "contracts." February 11, 1993 Letter, p. 4.

■■■ Furthermore, under *Kreindler,* "as to each such claim [for payment of a mortgage subsidy], the six-year statute of limitations period of § 3731(b)(1) 'begins to run on the date the claim is made, or, if the claim is paid, on the date of payment.'" *Supra,* at 1157 (quoting *Blusal Meats, Inc. v. United States,* 638 F.Supp. 824, 829 (S.D.N.Y.1986), *aff'd* 817 F.2d 1007 (2d Cir.1987)). Thus, the government's claims under the False Claims Act are timely with respect to each claim for a mortgage subsidy payment, and each pay-

ment of CDBG funds to the Village, after March 22, 1984.

█ *Kreindler* also held that the government's knowledge of the falsity of a claim does not automatically bar the claim for a False Claim Act violation. In rejecting the defendant's claim that government knowledge of a claim's falsity automatically bars any False Claims Act action, the court adopted the Ninth Circuit's holding in *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991), that if the defendants knowingly presented or caused to be presented false or fraudulent claims, then it is not a defense that the government officials also knew the claims were false but continued to pay the claims. *Kreindler*, 985 F.2d at 1156. Although government knowledge of the relevant information may show that the defendant had made full disclosure and did not submit false claims knowingly or with reckless disregard for the truth, that is not the instant case. The undisputed facts demonstrate that the Village Defendants knowingly caused false claims to be presented and that, after the government became aware of the underlying scheme, it continued to pay claims only because it had already become contractually bound to make those payments as a result of the defendant's fraudulent course of conduct. In this situation, the rule of Kreindler and *Hagood* provides that government knowledge of the falsity of the claims is not a defense at all.

█ The defendants further claim that the False Claims Act claims are preempted by the Fair Housing Act because the alleged false claims involve racial discrimination in housing and a failure to implement the requirements of the AFHMP regulations promulgated under Section 3608(e)(5) of the Fair Housing Act. The defendants cite *United States v. Davis*, 803 F.Supp. 830, 865 (S.D.N.Y.1992) in which Judge Conboy held that the government was precluded from pursuing claims under the False Claims Act and federal common law, despite allegations that contracts had been awarded to a subcontractor in exchange for bribes and kickbacks because those remedies were preempted by the more precisely drawn, detailed Anti-

Kickback Act. However, this aspect of the district court's decision in *Davis* was reversed by the Second Circuit, *United States v. General Dynamics Corp.*, 19 F.3d 770 (2d Cir.1994), which adopted the view recently expressed by the Supreme Court that "[r]edundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." *Connecticut National Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (quoting *Wood v. United States*, 41 U.S. (16 Pet.) 342, 363, 10 L.Ed. 987 (1842)).

Thus, whether or not the acts that form the basis for the False Claims Act violations also form the basis for Fair Housing Act violations is irrelevant. As the Second Circuit has stated:

> We "are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary to regard each as effective." 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). *See also Romano v. Luther*, 816 F.2d 832, 840 (2d Cir.1987).

*Local 1814, International Longshoremen's Ass'n, v. New York Shipping Ass'n*, 965 F.2d 1224, 1237 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 406, 121 L.Ed.2d 331 (1992).

In fact, Congress specifically recognized the possibility that False Claims Act violations may involve the violation of some other federal statute or regulation. The Act's legislative history indicates that it was intended to cover "each and every claim submitted under a contract ... which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or *in violation of any statute or applicable regulation ...*" S.Rep. No. 345, 99th Cong.2d Sess. at 9 (1986) (emphasis added), reprinted in 1986 U.S.Code Cong. & Admin.News, 5266, 5274. Thus, in view of the Second Circuit's rejection of Judge Conboy's decision in *United States v. Davis,* there is no support for the Village Defendants' position that the government's False Claims Act claims are preempted by the Fair Housing Act.

Accordingly, the government is entitled to summary judgment against the Village Defendants under the False Claims Act for each mortgage subsidy payment made by HUD to Lend–Mor and each payment of CDBG funds made to the Village after March 22, 1984.

### C. False Claims Act Violations: Brady and Parente.

█ The government bases its claim that Brady and Parente are liable for False Claims Act violations on the theory that Brady and Parente conspired with Scully, or the Village, to violate the Act—Brady by selecting purchasers in violation of the first-come, first-served selection principle and Parente by giving Scully a note telling him to give houses to Trustee McGinty's sons. *See* Plaintiff's Renewed Memorandum of Law, pp. 55–57. The general principle that each co-conspirator is guilty for the acts of a co-conspirator applies to violations of the False Claims Act. *See United States v. Bd. of Education,* 697 F.Supp. 167, 177 (D.N.J. 1988); *United States v. Uzzell,* 648 F.Supp. 1362, 1368 (D.D.C.1986).

█ However, an essential element of any cause of action for conspiracy, including one brought under the provisions of the False Claims Act, is an "agreement among two or more persons to commit a crime ..." *Blusal Meats, Inc. v. U.S.,* 638 F.Supp. at 828 (citing *United States v. Martino,* 664 F.2d 860, 876 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982)). Although the government has established certain acts committed by Parente and Brady which may have contributed to the Village's False Claims Act violations, the government has failed to establish the existence of an agreement or meeting of minds among the alleged co-conspirators. Accordingly, there is a genuine issue of material fact that is fatal to the government's motion for summary judgment against Brady and Parente based on violations of the False Claims Act committed by the Village Defendants.

However, in view of the court's rejection of the Village Defendants' legal arguments in opposition to the government's motion and the failure of Brady, Parente and McGinty to establish a lack of involvement in specific acts which may have resulted in False Claims Act violations, those defendants are not entitled to summary judgment dismissing those claims.

### D. The Government's Remedy.

█ Under 31 U.S.C. § 3729(a), civil penalties are to be imposed for each false or fraudulent claim that the Village Defendants caused to be presented, for each false statement or record used to get a false or fraudulent claim paid and for each conspiracy to defraud. 31 U.S.C. § 3729(a)(1), (2), (3). As discussed above, the government has failed to prove a conspiracy under the False Claims Act. The defendants are however liable for civil penalties with respect to each monthly mortgage subsidy claim submitted by Lend–Mor since March 22, 1984 and for each false statement or record used to get a false or fraudulent claim paid. The government has requested that the court schedule an inquest to determine the precise amount of the civil penalties for which the Village Defendants are liable. The determinations which must be made at that inquest are: (1) the number of mortgage subsidy claims submitted by Lend–Mor since March 22, 1984; (2) the number of false statements or records used to get a false claim paid since March 22, 1984; and (3) the damages sustained by the government because of the False Claims Act violations.

The amount of damages sustained by the government includes all the CDBG funds and Section 235 mortgage subsidies paid by the government since March 22, 1984. As a result of the Village Defendants' fraudulent conduct, these funds were paid by the government to attain goals in contravention of HUD's affirmative obligation to administer its programs to further the purposes of the Fair Housing Act, 42 U.S.C. § 3609, by *inter alia* ensuring equal access to "individuals of similar income levels ... regardless of race." 24 C.F.R. § 200.610. The limited funds that were diverted by the defendants' fraudulent course of conduct would otherwise have been available to HUD to further its goals. Accordingly, the amount of those funds is an appropriate measure of the damages sustained by the government.

The government seeks treble damages as well as a penalty of between $5,000 to $10,000 for each of the false claims. The 1986 amendments to the False Claims Act changed the civil penalties from double to treble damages and from $2,000 per claim to the range sought by the government. The false claims that are the subject of this action include both claims that predate these amendments, as well as claims made after the enactment of the 1986 amendments to the False Claims Act. The amount of the penalties for which the defendants are liable with respect to violations that pre-date the 1986 amendments depends on whether the False Claims Act amendments are applied retroactively.

Neither the language of the statute nor its legislative history provide guidance as to Congress' intention with respect to retroactive application of these amendments. *See United States v. Murphy,* 937 F.2d 1032, 1036–37 (6th Cir.1991).

■■■ In *Landgraf v. USI Film Products,* — U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), which concerned the retroactivity of provisions of the Civil Rights Act of 1991, the Court addressed the "apparent tension" between two principles of retroactivity—the rule that "a court is to apply the law in effect at the time it renders its decision," *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), and the contrasting rule that "[r]etroactivity is not favored in the law," *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). The Supreme Court concluded that, in the absence of clearly expressed legislative intent which requires retroactive application, a statute should not be applied retroactively if "it would impair rights a party possessed when he acted, *increase a party's liability for past conduct,* or impose new duties with respect to transactions already completed." *Landgraf,* at ——, 114 S.Ct. at 1505. Thus, the increased penalty provisions would clearly not apply to any of the claims that predate the 1986 False Claims Act.

Furthermore, although the action against the Village Defendants is timely with respect to claims made after March 22, 1984, it is not at all clear that the increased penalties should apply to those claims. All of defendants' conduct which forms the basis of those claims occurred prior to enactment of the 1986 amendments. Although that fraudulent conduct remained inchoate and emerged to render the claims false when made, under the rule expressed by the Court in *Landgraf,* it would be inappropriate to apply the treble damages and increased penalty provisions to increase defendants' liability for conduct engaged in by defendants prior to the enactment of the 1986 amendments to the False Claims Act.

### III. *Fair Housing Act.*

#### A. Village Defendants' Liability for Scully's Acts.

■■■ The government bases its Fair Housing Act claims against the Village Defendants in large part on Scully's acts in administering the Section 235 program. As discussed above with respect to the False Claims Act, the Village Defendants would be liable for these acts, because they were within the scope of Scully's actual and apparent authority, under principles of respondeat superior. The applicability of respondeat superior to violations of the Fair Housing Act has been widely recognized. *Chicago v. Matchmaker Real Estate Sales Center, Inc.,* 982 F.2d 1086, 1096 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2961, 125 L.Ed.2d 662 (1993); *Marr v. Rife,* 503 F.2d at 740–42; *United States v. Northside Realty Associates, Inc.,* 474 F.2d 1164, 1168 (5th Cir.1973), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1483, 47 L.Ed.2d 747 *reh'g denied,* 425 U.S. 985, 96 S.Ct. 2192, 48 L.Ed.2d 810 (1976). Thus, these acts can form the basis of the Village Defendants' liability under the Fair Housing Act.

#### B. Fair Housing Act Violations: the Village Defendants.

■■■ The Fair Housing Act was enacted by Congress to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Act prohibits all practices which deny housing to persons because of race, color, religion, sex,

familial status, or national origin. 42 U.S.C. § 3604. The Fair Housing Act applies not only to intentional housing discrimination, but to all policies or practices which have a discriminatory effect, even absent discriminatory intent. *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934–36 (2d Cir.1988) ("*Huntington* "), *aff'd,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988), *reh'g denied,* 488 U.S. 1023, 109 S.Ct. 824, 102 L.Ed.2d 813 (1989).

The government proposes various theories as grounds for the Village Defendants' liability under the Fair Housing Act, including both intentional discrimination and disparate impact claims.

**(i) Intentional discrimination.** The government's claim that the administration of the Section 235 program was intentionally discriminatory is based on Scully's testimony to the effect that certain of the Village trustees, particularly Dan Kikkert and Jim Brady, expressed concern about the "potential that blacks would be brought into the community." Scully Dep. 283; Pl's 3(g) St. ¶ 19. The government also notes that Brady asserted his Fifth Amendment privilege when questioned at his deposition about whether he used the word "nigger" while discussing the Section 235 program with other members of the Village Board. Pl's 3(g) St. ¶ 20.

▆ The government may rely on Brady's assertion of his privilege against self-incrimination to show intent only if that inference is supported by independent evidence. *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 683 F.Supp. at 1452. The only independent evidence that the government has offered to support its assertion of an intent to discriminate is that described above—Scully's deposition testimony that, when Mayor Parente described the Section 235 program at a Village board meeting, Brady and Kikkert expressed concern about bringing blacks into the Village.

The determination of "whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Develop-*

*ment Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). In fact, the difficulty of proving intent is one of the factors the courts have considered in recognizing that discriminatory effect can provide the basis for a Fair Housing Act violation, even in the absence of a showing of discriminatory intent. *See, e.g., Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1289 (7th Cir.1977) ("*Arlington* "), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978).

▆ The government's reliance on Kikkert's and Brady's expressions of concern to prove intent places too heavy a burden on those statements. This court would not have performed the sensitive inquiry described by *Arlington Heights* were it to base a finding of discriminatory intent on those expressions of concern, provided here without the benefit of context. Even if this court were willing to accept the inference that Brady used the word "nigger" in the context of discussions about the Section 235 program, it could not conclude that the government had established invidious discriminatory intent as a motivating factor in administering the Section 235 program. Accordingly, further factual inquiry inappropriate to a court's determination on motion for summary judgment would be needed to make a finding of intent.

▆ **(ii) Discriminatory effect.** Discriminatory intent is not needed to establish a prima facie case of disparate impact in a Fair Housing Act case against public defendants, such as the Village Defendants. *Huntington,* 844 F.2d at 934. A prima facie case is established by showing that the challenged practice actually or predictably has a discriminatory impact, either by adversely affecting a particular minority group or generally by the perpetuation of segregation. *Huntington,* at 937. A prima facie case may be defeated if the defendant can prove that "its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington,* at 936 (citing *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 148–49 (3d

Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978)).

■ The scheme for selecting participants in the Village's Section 235 program is the type of facially neutral policy that could give rise to a Fair Housing Act violation if it were shown to have a predictable or actual disparate impact on a particular group. The Phase I and Phase II purchasers who were given advance notice of the announcement of the program were pre-selected based on nepotism and word-of-mouth. Pl's 3(g) St. ¶¶ 26–28, 32–39. The Phase III purchasers were selected from Village residents who were informed of the availability of the housing by word-of-mouth. Pl's 3(g) St. ¶¶ 43–46. The Village Defendants contend that this is a case of disparate treatment, rather than disparate impact, and that accordingly the government must prove intent. This court is not convinced. The government does not contend that blacks were excluded from applying for (or receiving) Section 235 houses by explicit Village policy but that they were discriminated against as a result of the apparently racially neutral selection process employed by the Village Defendants. Thus, regardless of whether the implicit intent of the policy was to exclude blacks, a disparate impact analysis of the case is appropriate.

The Supreme Court has held that both objective and subjective hiring criteria are subject to scrutiny under the disparate impact analysis in the context of employment discrimination. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 990, 108 S.Ct. 2777, 2786–87, 101 L.Ed.2d 827 (1988). In fact, nepotism has been specifically identified as an objective practice which can form the basis of a disparate impact violation. *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 657, 109 S.Ct. 2115, 2124–25, 104 L.Ed.2d 733 (1989).

■ The disparate impact approach of Title VII employment discrimination cases is applicable to Fair Housing Act cases brought against a public defendant. *Huntington,* 844 F.2d at 934. Thus, whether the selection criteria used by the Village are characterized as objective or subjective, it is clear that the disparate impact analysis is appropriate.

■ In order to establish a prima facie case, the plaintiff must go beyond a showing of statistical disparities. It is essential that the suspect practices be identified and causally linked with the demonstrated adverse impact. *Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2124. To begin the analysis, this court must compare the racial composition of the group which received (or predictably would receive) benefits as a result of the suspect selection process with the racial composition of the pool from which beneficiaries would have been selected otherwise. *Wards Cove,* 490 U.S. at 650, 109 S.Ct. at 2121; *Huntington,* 844 F.2d at 934, 938. Because the government's allegations of disparate impact relate to the exclusion of blacks, it is the percentage of blacks in these groups which must be analyzed. *See, e.g. Rich v. Martin Marietta Corp.,* 522 F.2d 333, 346 (10th Cir. 1975).

■ The Section 235 program in the Village was part of the County-wide HAP, pursuant to which the County filed an AFHMP which undertook to market proposed housing aggressively to minority groups. Pl's 3(g) St. ¶ 16. The AFHMPs filed with respect to Phases I and II of the Village's program specifically contemplated outreach to the minority population within the adjacent Long Beach community, and stated that the anticipated minority occupancy goals for the Village's Section 235 housing are "greater than" the Village and County averages. Pl's 3(g) St. ¶¶ 17, 30. Although no AFHMP was filed with respect to Phase III, presumably because of the need to act prior to expiration of the program, Pl's 3(g) St. ¶ 41, the obligation to conduct the program in accordance with HUD's affirmative fair housing marketing policies was no less real. *See* 24 C.F.R. §§ 200.610, 200.620, 200.625.

The government has submitted undisputed census figures which indicate that the black population of the Village in 1980 was 0.47%.[6]

**6.** The Village Defendants' purported "dispute" with the census figures consists of the submission of additional census figures regarding the total

"minority" population of the Village. The Village Defendants include as minorities the black population (which was, and continues to be mini-

In contrast, the black population of the Nassau County Consortium was 9.5% and that of Long Beach, a specific target area for the program, was 9.6%. The undisputed facts indicate that *no* blacks received any of the Section 235 houses in the Village. Pl's 3(g) St. ¶ 49.

Even a cursory review of these statistics indicates that the Section 235 program provided significantly disparate housing opportunities for blacks and whites in the Village. The conclusion that this disparity was the predictable result of the specific practices of the Village in administering the program is similarly readily apparent.

Scully pre-selected the purchasers of Section 235 houses from Village residents who were "his special friends and family" or friends and relatives of Village trustees. Pl's 3(g) St. ¶¶ 24, 28, 36, 39, 46. The Village had a black population of less than 0.5%, and by further limiting benefits to those who were "connected" to Village officials, Scully assured that the opportunities for blacks to benefit from the program were nil. This result was further guaranteed by additional aspects of the pre-selection process. The pre-selected Phase I and Phase II purchasers were given advance notice of when the program was to be advertised and were advised to deliver their letters to Village Hall prior to 9:00 a.m. on the day in question. Pl's 3(g) St. ¶¶ 22–23, 32–34. Individuals from outside the Village who inquired about the Section 235 program were advised that they were not eligible. Pl's 3(g) St. ¶ 29. The minority outreach program required under the Phase II AFHMP was conducted to practically insure its failure. The advertisement in El Diario was never published and the advertisement in the Amsterdam News was not published until December 3, 1981, more than two weeks after the program was officially announced. Pl's 3(g) St. ¶ 40. Notices about the program were not sent to minority organizations until December 3, 1981, more than two weeks after Scully began informing people orally that the twenty-two houses had already been distributed. *Id.*

The conduct of Phase III of the Section 235 program was no less egregious and the disparate effects of that conduct were just as predictable. Phase III was never advertised. Purchasers were selected, initially, from the Phase II list, but *only* from among Phase II applicants who were also Village residents. Pl's 3(g) St. ¶¶ 41–43. The availability of Section 235 houses in Phase III was advertised solely through word-of-mouth by Village officials, thereby closing off the possibility of any black applicants. Pl's 3(g) St. ¶ 44.

It is clear that the specific procedures for allocating Section 235 houses in the Village were designed to limit program beneficiaries—preferably to friends and relatives of Village officials and otherwise to Village residents. The inevitable result of those allocation procedures was to remove *all* blacks from the pool of applicants for benefits.

 To complete the *Wards Cove* analysis, it is necessary to compare that population with the pool from which potential beneficiaries of the Section 235 program *should* have been chosen pursuant to the County AFHMP, the Phase I and II AFHMPs filed with respect to the Village's program, and HUD's affirmative fair market housing regulations. The black population of the targeted market, however it is defined, was considerably greater than that of the Village: as noted previously, according to 1980 census figures the Nassau County Consortium had a black population of 9.5%, Nassau County had a black population of 6.8%, and Long Beach, a specific target market under the Village's AFHMP, had a black population of 9.6%. Pl's Analysis, at 6, fn. 3. The contrast between the racial composition of these communities and that of the Village is stark and leads to the inevitable conclusion that the pre-selection procedures used by the Village were a perversion of the first-come first-served requirements for the program and present a prima facie case of a disparate impact violation under the Fair Housing

mal) and the Hispanic population. These figures

are not relevant to this Fair Housing Act cause of

Act.[7]

That these practices also perpetuated segregation in the Village is evident from a review of the 1990 census figures. The Village's black population increased from 23 in 1980 to 30 in 1990. Pl's 3(g) St. ¶ 1. Although that does represent an increase of 30% as noted by the Village Defendants, the Village's black population was still only 0.6%, a proportion that can hardly characterize a racially integrated population—particularly when contrasted with the black population of the Nassau County Consortium in general or the adjoining city of Long Beach. *See* Pl's Analysis at 6; Village Def's Counter–3(g) St., at 4.

■ Once the government has established its prima facie case, the defendant may be able to avoid liability under the Fair Housing Act by proving "that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington*, 844 F.2d at 936 (citing *Rizzo*, 564 F.2d at 148–49.)

■ The Village Defendants have not even attempted to justify their practices as serving a bona fide governmental interest. Instead, those defendants argue that the government has not established discriminatory impact because the Village is not segregated. The Village Defendants make this argument based on an analysis of census statistics that includes the Hispanic population as part of the Village's "minority" population. Village Def's Memo in Opposition, pp. 25–26. These statistics are irrelevant to the Fair Housing Act violation alleged by the government. The government's disparate impact case turns on the discriminatory effects of the Village Defendants' practices on blacks.[8] The Fair Housing Act protects specific classes of people from discrimination. It

prohibits discrimination in housing because of "race, color, ... *or* national origin." 42 U.S.C. § 3604 (emphasis added). Whether or not the Village's policies violated the rights of other protected groups, such as Hispanics, is irrelevant to whether the government has established the disparate impact of the Village's policies on blacks. *See Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346 (10th Cir.1975).

■ The Village Defendants also argue that the Fair Housing Act could not have been violated because the goal of the Section 235 program—to provide houses to qualified low-income families—were met inasmuch as all the recipients of houses met the economic guidelines for the program. This argument is without merit. Under 42 U.S.C. § 3608(e)(5), HUD is required to administer its housing and urban development programs to further the policies of the Fair Housing Act. The Village's pre-selection scheme, whether or not it was violative of HUD regulations or an AFHMP, clearly manipulated the program to limit beneficiaries to Village residents. The fact that the beneficiaries were economically qualified does not alter the effect of this manipulation on the racial composition of the pool from which purchasers were selected. The disparate impact of the Village's policy has been demonstrated. The Village Defendants have not demonstrated that the goals of the Section 235 program would not have been met equally as well if the Village had followed the non-discriminatory first-come first-served selection process required by HUD and the Village's own guidelines.

The government's claim for declaratory and injunctive relief under the Fair Housing Act is premised on 42 U.S.C. § 3614(a). This court has previously held that no statute of limitations applies to a suit for injunctive relief under this provision. *Island Park*, 791

action. *See* discussion, *infra*.

7. Because the court finds that the specific policies followed by the Village resulted in a disparate impact violation under *Wards Cove* and *Huntington*, it need not consider whether the Village Defendants' policies also violated HUD regulations and, accordingly, are actionable as implied violations of the Fair Housing Act itself.

*See Guardians Association v. Civil Serv. Comm. of City of New York*, 463 U.S. 582, 592, 103 S.Ct. 3221, 3227, 77 L.Ed.2d 866 (1983).

8. The 1980 census indicates that none of the Village's 345 Hispanic residents was black. Pl's Analysis, at 6, ¶ 1

F.Supp. at 368. The statutory provision reads as follows:

> Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter, *or* that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.

42 U.S.C. § 3614(a) (emphasis added).

The Village Defendants argue that the government's claim is not ripe for summary judgment because it has not established a "pattern or practice" of intentional discrimination. Village Defs' Memo in Opposition, at 30–32. The Village Defendants note that in *United States v. Yonkers Board of Education,* 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd* 837 F.2d 1181 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988), the pattern and practice claim was determined only after a prolonged trial during which the court heard the testimony of numerous witnesses and reviewed thousands of documents. Village Defs' Memo in Opposition, at 30.

■ The fact that a trial was needed to establish a violation of the Fair Housing Act in *Yonkers* can hardly be grounds for the general proposition that the Village Defendants seem to be urging, *i.e.,* that a pattern and practice claim is not appropriately addressed by motion for summary judgment. A nonmovant defeats a motion for summary judgment by showing that there exists a genuine factual issue with respect to which there is sufficient evidence such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In *Yonkers,* the court tried genuine factual issues—primarily related to discriminatory intent. In the instant case, this court finds no such issue of fact for trial. The inquiry into intent is unnecessary in this case inasmuch as the court has found that the Village's administration of the Section 235 pro-

gram constituted a disparate impact violation, and the Village Defendants have offered no justification for those practices. Nor is it necessary for this court to find that the pattern or practice alleged by the government in this case is of the dimensions which justified injunctive relief in *Yonkers* in order to find a violation of the Fair Housing Act. *See* Village Defs' Memo in Opposition, at 31.

■ The only appropriate inquiry for this court in determining whether the undisputed facts entitle the government to relief under 42 U.S.C. § 3614(a) is whether the government has established either a "pattern or practice" violation *or* a violation that involves the denial of fair housing rights to a group of people and that such denial raises an issue of general "public importance." *United States v. City of Parma, Ohio,* 494 F.Supp. 1049, 1094–95 (N.D.Ohio 1980), *aff'd in part and rev'd in part,* 661 F.2d 562 (6th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441, *reh'g denied,* 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982); *United States v. Hunter,* 459 F.2d 205, 217 (4th Cir.1972), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972), *reh'g denied,* 413 U.S. 923, 93 S.Ct. 3046, 37 L.Ed.2d 1045 (1973). The government has established *both.*

■ The Village's pre-selection scheme discriminated against the group of all black residents in the Nassau County Consortium by denying them the opportunity to apply for Section 235 houses, a right protected by the Fair Housing Act. The Attorney General's determination that this denial of rights raises an issue of general public importance, *see* Amended Complaint ¶ 120, is not reviewable by the court. *Yonkers,* 624 F.Supp., at 1291 n. 9; *United States v. City of Parma,* 494 F.Supp., at 1095 n. 64. Thus, the government has established its right to bring this suit under § 3614(a).

■ In addition, the government has established a pattern or practice violation. The practices which are the basis of the government's Fair Housing Act claims were more than an "isolated incident of unlawful discrimination." *City of Parma,* 494 F.Supp. at 1095; *see also United States v. Mintzes,* 304

F.Supp. 1305, 1314 (D.Md.1969); *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir.1964). The practices endured over the selection process for all three phases of the Section 235 program in the Village, from March 1980 through 1983. Forty-four homes were built in the Village under the Section 235 program, and purchasers for *all* of those homes were selected pursuant to the Village's discriminatory pre-selection scheme.

The government is accordingly entitled to summary judgment holding the Village Defendants liable under the Fair Housing Act claim.

■■■ The government has requested that this court enter declaratory judgment and order an inquest to determine the full range of relief to which it is entitled. Declaratory judgment is a form of relief sanctioned by the statute. The statute provides for the award of "such preventive relief, including a permanent or temporary injunction, restraining order, or *other order* against the person responsible for a violation ... as is necessary to assure the full enjoyment of the rights granted by this subchapter ..." 42 U.S.C. § 3614(d)(1)(A); *Hunter*, 459 F.2d at 219, n. 19. The government notes that declaratory judgment would serve an important remedial function because it would establish a predicate for increased penalties with respect to any additional violations, 42 U.S.C. § 3614(d)(1)(C), as well as for additional coercive relief, *Hunter, id.; Heights Community Congress v. Hilltop Realty Inc.*, 774 F.2d 135, 144 (6th Cir.1985), *cert. denied*, 475 U.S. 1019, 106 S.Ct. 1206, 89 L.Ed.2d 318 (1986). The court finds that declaratory judgment is an appropriate remedy and grants the government's request for an inquest to determine whether it is entitled to any additional relief.

### C. Fair Housing Act Violations: Brady and Parente

The government's assertion that Brady and Parente have violated the Fair Housing Act appear to be based in part on the conspiracy theory it advanced with respect to the False Claims Act violations. *See* Pl's Reply Memo, at 36 fn 14. As discussed with respect to the False Claims Act (at II.C.,

*supra* ), the government has not shown an explicit or implied agreement among the alleged co-conspirators. Although the government has established that Parente and Brady participated in the pre-selection scheme by requesting the allocation of Section 235 houses to specific parties, *see* Pl's 3(g) St. ¶¶ 36, 39, these isolated incidents do not establish the meeting of minds necessary for a conspiracy.

■■■ To the extent the government relies on the acts of Brady and Parente as constituting separate violations of the Fair Housing Act, distinct from a conspiracy theory, this court is not convinced that a disparate impact analysis would be appropriate, *see Huntington*, 844 F.2d at 934, nor has the government attempted to link Brady and Parente's acts with the disparate effect of the 235 program. Furthermore, the government has failed to establish intentional discrimination. *See* discussion, *supra.*

Accordingly, the government's motion for summary judgment against Brady and Parente is denied.

### D. Defendants' Cross-motion for Additional Discovery

The Village Defendants, Brady and Parente cross-move pursuant to Federal Rule of Civil Procedure 56(f), requesting that this court defer ruling on the government's motion for summary judgment on the Fair Housing Act claim to allow them to conduct additional discovery.

Under Rule 56(f), a court may, *inter alia,* order a continuance to permit a party opposing a summary judgment motion to conduct discovery to ascertain "facts essential to justify the party's opposition ... " Fed.R.Civ.P. 56(f). "[A] party seeking such discovery must file an affidavit explaining (1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort the affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir.1989) (citing *Burlington Coat Factory Warehouse Corp. v.*

*Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir. 1985)).

■ The Village Defendants support their motion by submitting an affidavit of counsel, William H. Pauley III, requesting additional time to depose certain defendants as well as non-party witnesses with respect to the question of intent. The Village Defendants also request time to conduct discovery with respect to the racial and ethnic background of individuals who submitted letters of interest to the Village in connection with the Section 235 program. Because the court finds the Village Defendants liable under a disparate impact theory, neither of these issues are relevant to the court's disposition.

Because the court denies the government's motion for summary judgment against Brady and Parente, their request for a continuance to conduct further discovery is moot.

## IV. *Erroneous Payment of Funds.*

The government's eighth cause of action is for erroneous payment of funds with respect to CDBG payments and Section 235 mortgage subsidies made after March 22, 1984. The government asserts joint and several liability for this claim against the Village Defendants, Brady, Parente and the Homeowner Defendants (other than the Ruoccos).

This claim is based on the United States' common law right to recover funds wrongfully or erroneously paid from the federal treasury. *United States v. Wurts,* 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938). It has also been characterized as a claim for diversion of money paid under a grant program. *See Island Park,* 791 F.Supp. at 370. Under 28 U.S.C. § 2415(b), this action must be brought "within six years after the right of action accrues." This court has previously held that this cause of action is time-barred except for "*possible* causes of action that may have accrued after March 22, 1984." *Island Park,* 791 F.Supp. at 370 (emphasis in original).

Thus, as an initial matter, this court must determine whether any cause of action for erroneous payment of funds accrued after March 22, 1984. The government takes the position a new cause of action for erroneous payment of funds accrues with each payment made by HUD, arguing that a cause of action to recover any particular payment cannot possibly accrue until those funds are actually paid. Although the legal authority relating to this issue is sparse, the cases cited by the government support this result. In *Wurts,* the Court held that the statute of limitations on the government's suit to recover an erroneous refund of taxes began to run when that payment was made, rather than when the refund was allowed by the Commissioner of Internal Revenue. 303 U.S. at 417, 58 S.Ct. at 638–39. *See also United States v. Dekalb County,* 729 F.2d 738, 739 (11th Cir.1984) (suit to recover tax funds erroneously paid over a seventeen year period because of the same mistake was timely under 28 U.S.C. § 2415(a) with respect to refunds paid less than six years before suit was filed, but not with respect to those paid more than six years prior thereto).

■ In *United States v. Batson,* 706 F.2d 657 (5th Cir.1983), *cert. denied,* 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986), the government sued to recover excess federal crop subsidies paid to defendants by the Commodity Credit Corporation. A six-year statute of limitations applied[9] and defendants had completed all acts related to their scheme more than six years before the government filed for recovery. Because the cause of action was found to accrue when the crop subsidies were actually paid, the action was time-barred only with respect to payments made more than six years before suit was filed, not those made within the six year period. *Batson,* 706 F.2d at 672, 673. Thus, to the extent the government has a cause of action for recovery of erroneously paid Section 235 mortgage subsidies or CDBG funds, that action would be timely with respect to any such funds paid after March 22, 1984.

The Village Defendants argue that, in any case, the government may not assert a claim for erroneous payment of funds against them

---

**9.** The applicable statute of limitations provided that an action "against the [Commodity Credit] Corporation ... shall have been brought within six years after the right accrued on which suit is brought ..." 15 U.S.C. § 714b(c).

because they were not the recipients of the funds. Generally, the right to recover funds wrongfully paid must be asserted against the recipient of those funds or a third party into whose hands the mistaken payments flowed "where that party participated in and benefitted from the tainted process." *LTV Educ. Systems, Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir.1989) (citing *United States v. Mead*, 426 F.2d 118 (9th Cir.1970)); *see also United States v. Blue Cross and Blue Shield of Michigan*, 726 F.Supp. 1517, 1521 (E.D.Mich. 1989).

The Village Defendants contend that no CDBG funds were paid to the Village after March 22, 1984. However, the government has submitted a report which indicates at least some CDBG funds were paid after that date. *See* Pl's Analysis, Exh. 18. The government argues that the Village Defendants are liable for the Section 235 mortgage subsidies that were paid to the innocent mortgagee, as well as for the CDBG funds, because the Village enjoyed benefits as a result of the program. Pl's Reply Memo, at 83–84. The government's argument is not compelling. In *LTV Educ. Systems, supra*, the defendant was held liable for the amount of the loans erroneously paid to students, where those amounts were then paid to the defendant in the form of tuition. 862 F.2d at 1175. The only case cited by the government in which defendants were found liable for the repayment of funds they never received involved erroneous payments for "farmer's conservation practices" which were made by the government to a third party contractor for work performed in defendants' behalf. *United States v. Mead*, 426 F.2d at 124. Thus, although the defendant farmers never received the erroneously paid funds, they directly benefitted in that they received the completed conservation projects for which those funds paid. *Id.*, at 125.

■ The benefit to the Village Defendants in this case were much more amorphous and indirect. For example, the government points to the fact that the Section 235 program benefitted the Village by providing subsidies to Village residents and expanding its tax base. *See* Pl's Reply Memo, at 83. The leap that is required to allow a

cause of action for erroneous payment of funds to lie against the Village Defendants based on their receipt of these indirect and unquantifiable benefits is one that this court is not willing to make.

Alternatively, the government would impose liability on the Village Defendants based on the existence of a conspiracy among the Village Defendants, Brady, Parente and the Homeowner Defendants. Under that theory, the government argues, if any of the co-conspirators was liable for the erroneous payment of funds, all of the co-conspirators would share joint and several liability for those damages. Thus, if the Homeowner Defendants were co-conspirators and were liable under an erroneous payment of funds theory for the mortgage subsidy payments made on their behalf, all co-conspirators would be liable for repayment of those funds as well.

■ As discussed previously, the government has not established the existence of a conspiracy between the Village Defendants, Brady and Parente. *See* Discussion, at II.C., *supra*. Neither has the government set forth facts to establish the necessary meeting of minds for a conspiracy between the Village Defendants and the Homeowner Defendants. *See* Discussion, *infra*. Thus, regardless of whether the Homeowner Defendants are liable for repayment of the Section 235 mortgage subsidies paid in their behalf, the court will grant summary judgment holding the Village Defendants liable under this claim only with respect to the CDBG funds it received after March 22, 1984.

HUD's continued payment of the CDBG benefits despite its knowledge of the fraudulent scheme does not give rise to a defense of estoppel. In *Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), the Court held that, because the Appropriations Clause of the Constitution, Art. I, § 9, cl. 7, limits the payment of funds from the Treasury to that authorized by statute, estoppel could not be upheld against the government in a case involving payment of public funds. Although in *Office of Personnel Management*, the issue of estoppel was raised in the context of a claim against the government for benefits,

the same result would necessarily follow in an action for return of funds wrongfully paid from the federal treasury. *See, e.g., United States v. Fowler,* 913 F.2d 1382 (9th Cir. 1990). The government has established that the CDBG funds that were paid to the Village were paid in violation of the Fair Housing Act and HUD regulations and accordingly should not have been paid. In the language of the Court, it is clear that "[i]n this context there can be no estoppel, for courts cannot estop the Constitution." *Office of Personnel Management v. Richmond,* 496 U.S. at 434, 110 S.Ct. at 2476.

■ Unlike the Village Defendants, the Homeowner Defendants received a direct benefit from HUD's payment of Section 235 mortgage subsidies. The government has a right to recover payments made under an erroneous belief which was material to its decision to pay those funds, regardless of whether the recipient of those funds was innocent of any wrongdoing. *See, e.g., Mt. Vernon Cooperative Bank v. Gleason,* 367 F.2d 289 (1st Cir.1966) (government had a right to recover from a bank amounts it paid pursuant to guarantee of veteran's loan when it discovered that the veteran's loan application was a forgery); *see also, Weiss v. United States,* 296 F.2d 648 (5th Cir.1961).

■ The Homeowner Defendants contend that, because they were economically qualified to receive the Section 235 houses and mortgage subsidies, the funds were not "erroneously" paid to them. However, as developed at great length above, the government has established that the Section 235 mortgage subsidies were allocated to, and paid on behalf of, purchasers who were pre-selected by the Village Defendants, in violation of numerous federal statutes and regulations. Had the Section 235 program been administered as it was meant to be, the mortgage subsidies would not have been paid for the benefit of the Homeowner Defendants who received their houses under the pre-selection scheme, but for the benefit of those who would have been selected on a first-come, first-served basis, pursuant to HUD regulations, the County AFHMP, the AFHMP's filed with respect to the program in the Village and the Fair Housing Act.

As discussed above with respect to the Village Defendants, HUD's continued payment of mortgage subsidies does not estop the government from asserting its right to recovery against the Homeowner Defendants. Thus, each of the Homeowner Defendants is liable for the repayment of any Section 235 mortgage subsidies paid in its behalf since March 24, 1984. Although there is some case law supporting an imposition of joint and several liability for return of federal funds on all those participating in actions which caused their wrongful payment, *LTV Educ. Systems, Inc. v. Bell,* 862 F.2d at 1175; *United States v. Mead,* 426 F.2d at 124–5, the imposition of joint and several liability appears to be limited to knowing participants in the tainted transaction.

■ Although the government has established that each of the Homeowner Defendants against whom it seeks summary judgment was pre-selected, it has not established either that there was the meeting of minds needed to show a conspiracy or that the Homeowner Defendants' participation was knowing. It has, however, established the existence of a genuine material issue of fact as to each of the Homeowner Defendant's knowledge of his participation in the pre-selection scheme:

(1) the Ciccimarros have not refuted the government's assertions (based on Scully's testimony) that they were called prior to the appearance of the newspaper ad with respect to Phase I of the Section 235 program and that they delivered their letter to Village Hall before 9 a.m. on the day the ad was to appear. Pl's 3(g) St. ¶¶ 22–27. Thus, the government has established that the Ciccimarros were preselected. The Ciccimarros' denial of knowledge of the scheme is carefully limited to lack of knowledge of "purpose or intent ... to manipulate availability of housing to [d]efraud the United States and HUD of money ... to exclude Blacks and Hispanics from housing in Island Park." Aff. of J. Ciccimarro ¶ 3A.

In addition, the government has submitted Michael DeLessio's testimony that he was told by Anthony Ciccimarro in the fall of 1979 that he would get a Section 235 house.

Pl's 3(g) in Opp. ¶ 7. Thus, the government has established at least a question as to whether Anthony Ciccimarro was aware that he was participating in some sort of pre-selection scheme.

(2) Scully's testimony establishes that the Guerins, DiDomenicos and Moores were preselected for participation in the Section 235 Program. Scully testified that the Guerins were put on the list of preselected Phase II purchasers at Brady's request and that the DiDomenicos and Moores were also on the list. Scully also testified that these purchasers were notified in advance of the appearance of the newspaper ad announcing Phase II. The Guerins, DiDomenicos and Moore have not denied that they were informed of the newspaper ad relating to Phase II prior to its appearance and that they delivered their letter applications to Village Hall prior to 9 a.m. on the date it was to appear. Instead, each of those defendants carefully deny knowing in advance that they "would receive" or "would be selected to receive" a Section 235 house prior to November 19, 1981, the date the ad was to appear. Furthermore although these defendants deny knowledge of the Village's manipulation "of the availability of Section 235 Housing," the government has submitted independent testimony which raises a question of fact as to the extent of their knowledge: DeLessio attests to (a) the Guerins' visit to the site of their house prior to November 1981, (b) conversations with Donna Moore's father, Joseph DiGiacomo, in which DeLessio's wife advised DiGiacomo to ask Masone for a house, and (c) conversations with Joseph DiDomenico and Masone in which Masone told them he was giving them houses and advised them about how the process would work. DeLessio also asserts that he and DiDomenico were informed of the newspaper ad before it appeared and delivered their application letters together to Village Hall at 6:00 a.m. on the appointed day.

(3) Daniel McGann received a Phase III house despite the fact that he never applied for a Phase II house and despite the fact that many unsuccessful Phase II applicants were not informed of the availability of houses under Phase III. Scully testified that Mrs. McGann reviewed and approved the list of Phase III purchasers which included her son. Pl's 3(g) St. in Opp. ¶ 16. Daniel McGann invoked his Fifth Amendment privilege when questioned about his mother's role in the selection process and his knowledge of that role. (The court has precluded Daniel McGann's affidavit in opposition because of abuse of the discovery process. *See* discussion, *supra.* In any case, even the stricken affidavit fails to deny either Geraldine McGann's use of influence to get her son a house or Daniel McGann's knowledge of her role.) In addition, Geraldine McGann asserted her Fifth Amendment privilege when asked whether she discussed the Section 235 program with her son. Pl's 3(g) St. in Opp. ¶ 17. Although this clearly does not establish that McGann knew that his mother used her influence, it creates a material issue of fact as to whether the McGanns knowingly participated in the pre-selection scheme.

(4) DeLessio's declaration includes assertions which create a material issue of fact as to the Ruoccos (who have moved for summary judgment dismissing the complaint but against whom the government has not moved). DeLessio testifies that he told Ruocco to talk to Masone about a Section 235 house for himself in the fall of 1979 and that, soon thereafter, Ruocco told him he was going to get a Section 235 house. Pl's 3(g) St. in Opp. ¶ 22. Although the Ruoccos were not on the original list of Phase I purchasers, the government asserts they received a Phase I house after two of the originally selected purchasers dropped out. Ruocco submitted a letter of interest on March 26, 1980, after Phase I was advertised. Ruocco asserts that he was not advised prior to March 26, 1980 that "we would receive Phase 1 Section 235 housing." Ruocco Aff. ¶ 5. However Ruocco does not deny being told that he would receive Section 235 housing, thus creating at least a material issue of fact as to whether the Ruoccos were preselected and the extent of their knowledge of the scheme.

Because the government has not established either the existence of a conspiracy or the Homeowner Defendants' knowing participation in the pre-selection scheme, this court will not impose joint and several liabili-

ty against the Homeowner Defendants for all payments made pursuant to the scheme. Accordingly, the government is entitled to summary judgment against each of the Homeowner Defendants for erroneous payment of federal funds only to the extent mortgage subsidy payments have been made in their behalf after March 22, 1984.[10] As noted below, *see* V., the Ciccimarros and the DiDomenicos are the only Homeowner Defendants who received mortgage subsidies which have not been repaid since March 22, 1984. Summary judgment is accordingly granted against the Ciccimarros and the DiDomenicos for erroneous payment of funds.

In addition, the government is entitled to an order directing that the Homeowner Defendants pay the full amount of their monthly mortgage payments in the future to prevent wrongful payment of federal funds in the future.

## V. *Unjust Enrichment.*

■ The government has moved for summary judgment against the Homeowner Defendants on its claim for unjust enrichment. This court has held that the six year statute of limitations set forth in 28 U.S.C. § 2415(a) is applicable to a claim for unjust enrichment as a claim based on a species of implied contract. Thus, this claim applies only with respect to any incidents of unjust enrichment that occurred since March 22, 1984. *Island Park,* 791 F.Supp. at 369.

■ A claim for unjust enrichment is established by showing that "there was enrichment at the plaintiff's expense, and that the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff." *United States v. Nagelberg,* 772 F.Supp. 120, 122 (E.D.N.Y.1991) (quoting *United States v. Rivieccio,* 661 F.Supp. 281, 293 (E.D.N.Y.1987)). No proof of wrongdoing is necessary. An innocent party may be unjustly enriched if he holds "property 'under circumstances that in equity and good conscience he ought not to retain ...' " *Na-*

*gelberg,* 772 F.Supp. at 123 (quoting *Rivieccio,* 661 F.Supp. at 292).

■ As demonstrated in the discussion of the claim for erroneous payment of funds, the Homeowner Defendants were unjustly enriched each month that they received a Section 235 mortgage subsidy that was intended to benefit another participant in the program—one chosen on the first-come first-served basis consistent with HUD regulations, the AFHMPs filed by the County and the Fair Housing Act. Furthermore, the Homeowner Defendants' enrichment was clearly at the expense of plaintiff—the United States government.

The Homeowner Defendants assert in opposition to the government's motion (and in support of their motions for summary judgment dismissing this claim against them) that they were economically qualified to receive the Section 235 housing and were approved by HUD for the same. As discussed above, the Homeowner Defendants' economic qualifications do not affect the conclusion that these were benefits that they received erroneously and unjustly. Furthermore, the fact that HUD continued to make mortgage subsidy payments despite its knowledge of the pre-selection scheme does not change the fact that these defendants were unjustly enriched and does not estop the government from making this claim. *See* Discussion at IV, *supra.*

■ Thus, the government is entitled to summary judgment on its unjust enrichment claim against the Ciccimarros and DiDomenicos, concededly the only Homeowner Defendants who received mortgage subsidy payments, which they have not repaid, after March 22, 1984. Because its claims for unjust enrichment against the other Homeowner Defendants rely on the existence of a conspiracy, summary judgment will not be granted. Those Homeowner Defendants' (the Guerins, Moores, Ruoccos and DiDomenicos) motion for summary judgment dismissing the unjust enrichment claims will be granted.

---

**10.** In the event the government establishes at trial that any of the Homeowner Defendants knowingly participated in the pre-selection scheme with the Village Defendants, the liability for erroneous payment of funds may be determined to be joint and several.

## VI. *Constructive Trust*

■ In its seventh claim for relief, the government seeks to impose a constructive trust on the Section 235 homes of the Homeowner Defendants and on any profits realized by Homeowner Defendants who sold their houses. This court has determined that no statute of limitations applies to the action for a constructive trust and that, accordingly, it is timely in its entirety. *Island Park,* 791 F.Supp. at 370.

The Second Circuit's summary of the New York law on constructive trusts in *Republic of Philippines v. Marcos,* 806 F.2d 344 (2d Cir.1986), *cert. dismissed,* 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987), is helpful in analyzing the government's claim under a constructive trust theory:

> As Judge Cardozo put it when he was on the New York Court of Appeals, "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919). The court " 'reserves freedom to apply this remedy to whatever knavery human ingenuity can invent.' " *Simonds v. Simonds,* 45 N.Y.2d 233, 241, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359, 363 (1978) (quoting Bogert, *Trusts and Trustees* § 471 at 29 (2d ed. rev. 1978)). And, " '[a] constructive trust will be erected wherever necessary to satisfy the demands of justice.... [I]ts application is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them.' " *Id.* at 241, 380 N.E.2d at 194, 408 N.Y.S.2d at 363 (quoting *Latham v. Father Divine,* 299 N.Y. 22, 27, 85 N.E.2d 168, 170 (1949)). *See also Restatement of Restitution* § 160 comment a (1937) (constructive trust is simply a remedy to prevent unjust enrichment and may or may not involve a fiduciary relationship); *id.* § 160 comment g (stating that where property is held by one person upon a constructive trust for anoth-

er and the former transfers the property to a third person who is not a bona fide purchaser, the interest of the beneficiary is not cut off); *id.* § 168 (same).

*Id.* at 355.

■ The elements of a constructive trust under New York law are (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment. *Brand v. Brand,* 811 F.2d 74, 77 (2d Cir. 1987); *United States v. Rivieccio,* 661 F.Supp. at 292; *Simonds v. Simonds,* 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978). However, because of its equitable nature, a constructive trust has been imposed in cases where not all of those elements are present. *See, e.g., Lines v. Bank of America Nat. Trust & Sav. Assn.,* 743 F.Supp. 176, 180 (S.D.N.Y.1990) (constructive trust imposed in absence of a fiduciary relationship or promise); *Simonds, supra,* 45 N.Y.2d at 241, 408 N.Y.S.2d 359, 380 N.E.2d 189 (constructive trust in the absence of a confidential or fiduciary relationship); *Coco v. Coco,* 107 A.D.2d 21, 24, 485 N.Y.S.2d 286 (2d Dep't), *appeal dismissed,* 65 N.Y.2d 637 (1985) (constructive trust in the absence of unjust enrichment).

In proposing its constructive trust theory, the government argues that federally-funded homes that should have been awarded on first-come first-served basis to a mix of applicants that included blacks, Hispanics and whites were instead diverted to the pre-selected white purchasers. Accordingly, a constructive trust should be imposed on these homes, which the government proposes to provide to black families, as part of the Fair Housing Act remedy in the Village. Pl's Further Memo in Support of Summary Judgment against Homeowners, at 34–35. (The government also proposes as an alternative remedy disgorgement of the Homeowner Defendants' as yet unrealized profits which would then be applied toward a fair housing remedy for the Village. Id., fn 9.)

In its attempt to fit the facts of this case into the constructive trust analysis, the government relies on Scully's (and by virtue of his apparent and actual authority, the Village's) fiduciary duty to the United States to

administer the CDBG funds and Section 235 program in accordance with the Fair Housing Act and HUD regulations. The government argues, first, that under an aiding and abetting or conspiracy analysis, the Homeowner Defendants owed the government a fiduciary duty. However, in view of the court's finding that the government has not established a conspiracy and its dismissal of the aiding and abetting cause of action, the fiduciary duty element cannot be based on this theory.

The government then urges the court to impose a constructive trust even absent a fiduciary relationship between the Homeowner Defendants and the United States government. In *Simonds*, a decedent failed to maintain life insurance policies for the benefit of plaintiff, his first wife, as required by his separation agreement and divorce decree. The court upheld the imposition of a constructive trust for the benefit of plaintiff on the proceeds of the policies which had been distributed to the second wife, even though she had done nothing wrong and had no fiduciary relationship with plaintiff. The court in *Simonds* noted that the fiduciary relationship between decedent and his first wife created a constructive trust which followed the funds into the hands of the second wife. So, the government argues, the constructive trust in this case attached to the CDBG funds (used in purchasing and improving land and marketing the Section 235 homes) as a result of the fiduciary duties owed by the Village and Scully to the government and followed the property into the hands of the Homeowner Defendants. Pl's Further Memo in support of Summary Judgment against Homeowner Defs, p. 37.

The government then identifies the second element of the constructive trust—the promise (express and implied in the Cooperation Agreements and in its undertaking to market the houses) to distribute the houses on a first-come first-served basis to the AFHMP pool and in compliance with the Fair Housing Act, the HUD regulations and the various AFHMPs involved. The government also notes that the Village promised not to discriminate based on race. In reliance on these promises, the government argues, CDBG money, mortgage subsidies and the Section 235 houses were transferred and the Homeowner Defendants were unjustly enriched by receiving houses at substantially below market value.

██ Despite the government's skillful manipulation of the facts to fit into a constructive trust analysis, and the latitude afforded in applying the remedy of constructive trust, *see Simonds, supra,* 45 N.Y.2d at 241, 408 N.Y.S.2d 359, 380 N.E.2d 189, the imposition of a constructive trust to undo the admittedly undesirable effects of the Village's administration of the Section 235 program would be a novel use of that remedy. Furthermore, the government has failed to demonstrate how the constructive trust ultimately resides in the Section 235 houses. It is useful for these purposes to follow the flow of funds and/or property on which the government seeks to impose the constructive trust, an exercise which neither the government nor the Homeowner Defendants undertook.

Approximately $650,000 in CDBG funds were used by the Village to purchase or improve the land which it then sold to the private developers from whom the Homeowner Defendants purchased their Section 235 houses.

██ Under the constructive trust analysis proposed by the government, a constructive trust attached to the CDBG funds which the Village had a fiduciary duty to administer lawfully. Generally, a constructive trust follows property despite changes in form. *See Frier v. J.W. Sales Corp.,* 261 A.D. 388, 25 N.Y.S.2d 576, 581 (1st Dep't 1941). The land that the Village purchased or improved with the CDBG funds was therefore also subject to a constructive trust. However, that land was sold to private developers. The law is clear that a constructive trust is cut off when the property is transferred to a bona fide purchaser. *Simonds,* 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189; Restatement, Restitution §§ 170 comment g, 172.

Although the government argues at length that the Homeowner Defendants' are not bona fide purchasers, they make no such

**458**

contention with respect to either Halandia Construction or Ocean Park Properties, the developers of the Section 235 housing. Thus, upon transfer of the property to Ocean Park and Halandia, any constructive trust which may have resided therein was cut off, and the trust attached to the proceeds realized by the Village on the sale. *See Caballero v. Anselmo,* 759 F.Supp. 144, 146 (S.D.N.Y.1991) (quoting Bogert, *Law of Trusts and Trustees* ). Accordingly, the government's constructive trust theory appears to fail at this juncture.[11] Because under a constructive trust analysis, the trust that was imposed on the CDBG funds did not follow the property upon its sale, it is difficult to discern how it would attach to the houses that were purchased by the Homeowner Defendants from the private developers.[12] It is therefore unnecessary to determine whether the Homeowner Defendants were bona fide purchasers or whether they were under actual or constructive notice of the existence of conflicting rights with respect to their Section 235 houses. *See* Pl's Further Memo in Opp. at 40–42.

The government's motion for summary judgment on the constructive trust claim is, accordingly, denied and Homeowner Defendants' motion for summary judgment dismissing this claim is granted.

### Conclusion

For the reasons set forth above, the government's motion for summary judgment is granted in part and denied in part. Summary judgment on (i) the government's claims under the False Claims Act for payments made after March 22, 1984, (ii) its Fair Housing Act claim, and (iii) its claim for erroneous payment of CDBG funds after March 22, 1984 is granted with respect to the Village Defendants and denied with respect to Brady and Parente. The government's motion for a declaratory judgment that the Village Defendants violated the Fair Housing

Act is granted. The Village Defendants' motion for additional time to conduct discovery with respect to the Fair Housing Act claim is denied. Brady and Parente's motions for summary judgment dismissing the False Claims Act and erroneous payment of funds claim against them is denied. Their request for additional time to conduct discovery with respect to the Fair Housing Act claim is moot because the government's motion for summary judgment against them on this claim is denied.

The government is granted summary judgment against Homeowner Defendants, the Ciccimarros and DiDomenicos, for erroneous payment of funds and unjust enrichment in the amount of the mortgage subsidies paid after March 22, 1984. An order directing those defendants to pay the full amount of their monthly mortgage payments hereafter is hereby entered.

The unjust enrichment claims against the Guerins, Moores, McGanns and Ruoccos and the constructive trust claim against all the Homeowner Defendants are dismissed. The Homeowner Defendants' motion to dismiss the erroneous payment of funds claim is denied.

Pursuant to 28 U.S.C. § 636(b)(1)(B), this matter is referred to Magistrate Judge Gold to conduct hearings and submit findings of facts and recommendations with respect to (i) the amount of any money damages and penalties due from the Village Defendants, the Ciccimarros and the DiDomenicos, and (ii) any further relief to which the government may be entitled under the Fair Housing Act.

SO ORDERED.

---

**11.** The Homeowner Defendants raise the "bona fide purchaser" exception solely with respect to their status in relation to the Section 235 homes. Neither the Homeowner Defendants nor the government deal with the bona fide sale of the property for which the CDBG funds were used to the developers and how that sale affects the constructive trust.

**12.** To the extent the government's theory is based on the mortgage subsidies paid for the Homeowner Defendants, there was no unjust enrichment in excess of actual value. The legal remedies that are available for unjust enrichment obviate the need for application of a constructive trust, even assuming the facts could be contorted somehow to fit that construct.